```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3
      UNITED STATES OF AMERICA,        )
 4                                     )
                        Plaintiff,     )
 5                                     )
                                       )
 6     -vs-                            )  Case No. 13 CR 442
                                       )
 7                                     )  Chicago, Illinois
      ERIC K. DILLARD,                 )  September 4, 2014
 8                                     )  2:30 o'clock p.m.
                        Defendant.     )
 9

10            TRANSCRIPT OF PROCEEDINGS - VOLUME 1
             BEFORE THE HONORABLE JOHN W. DARRAH
11
      APPEARANCES:
12
      For the Plaintiff:       HON. ZACHARY T. FARDON
13                             United States Attorney
                               BY:  MS. LINDSAY C. JENKINS
14                                  MR. RYAN P. FAYHEE
                               Assistant United States Attorneys
15                             219 South Dearborn Street
                               Chicago, Illinois 60604
16
      For the Defendant:       LAW OFFICE OF ROBERT K. CROWE
17                             BY:  MR. ROBERT K. CROWE
                               P.O. Box 6456
18                             Evanston, Illinois 60202

19

20

21                  Mary M. Hacker CSR, FCRR
                       Official Court Reporter
22                  United States District Court
               219 South Dearborn Street, Suite 1212
23                    Chicago, Illinois  60604
                     Telephone:  (312) 435-5564
24

25
```

1    (Proceedings had in open court:)

2    THE CLERK:  13 CR 442, United States versus Eric

3    Dillard.

4    THE COURT:  The file is still in my office but I

5    note -- do you want to identify yourselves for the record?

6    MR. FAYHEE:  Certainly, your Honor.

7    Lindsay Jenkins and Ryan Fayhee for the United

8    States.

9    MR. CROWE:  Ryan Crowe for Eric Dillard, the

10   defendant, who is present before the Court.  Good afternoon,

11   your Honor.

12   THE COURT:  I just saw and read for the first time

13   a motion by you, Mr. Crowe, to suppress certain testimony by

14   the agents on the grounds that certain reports were not

15   presented to you pursuant to Rule 16 disclosure, originally

16   back in -- a year ago, and then when you renewed, made a

17   specific request in April, that they again weren't disclosed

18   until very late.

19   Do you want to file a response to that, Ms.

20   Jenkins, Mr. Fayhee?

21   MS. JENKINS:  Actually, your Honor, I think we're

22   going to be in a position to significantly narrow the issues

23   that will be before you today.  I've discussed with Mr. Crowe

24   some of the information related to it.

25   The shortest version is, I turned those materials

1    over to Mr. Crowe as soon as I received them in preparation

2    for the suppression hearing two weeks ago, when we originally

3    -- when we were originally set to go.  I asked the agent to

4    help me identify the ways in which he was able to identify

5    the defendant, and I turned those reports over at that time.

6         THE COURT:  When did you first see them, Ms.

7    Jenkins?

8         MS. JENKINS:  The day I turned them over to

9    Mr. Crowe.

10        THE COURT:  Did you discuss with the agent why you

11   hadn't seen them earlier?

12        MS. JENKINS:  I did.  And I can explain a little

13   more in detail.

14        In connection with the hearing, I will say this:

15   The case agent whom I had been working with and who assisted

16   the U.S. Attorney's Office in charging this case, is not the

17   same agent who will be testifying here today.  That agent is

18   no longer based in Chicago.  And it was only based upon his

19   need to review his own database and records and reports to

20   determine whether or not there was any additional information

21   that could help him testify as to how he was able to identify

22   the defendant.

23        I would like to just say for the record that the

24   amount of material produced was a total of about 12 pages.

25   Only two pages -- excuse me.  Only two reports relate to the

1    identification of the defendant.  The rest of the material,

2    quite frankly, your Honor, is 3500 material that's being --

3    that was produced seven-and-a-half weeks before trial in this

4    case.  It has no bearing on the ability of the government to

5    identify -- to establish probable cause for purposes of

6    today's hearing.  In fact, it was just an early disclosure of

7    3500 materials related to the cooperating source and was

8    produced, frankly, out of an abundance of caution.

9            It certainly was not a malicious effort by the

10   government to do that.  We just found an additional report

11   that helped to identify both the Mountaineer and the

12   defendant.  The remaining material is 3500 material and

13   really has no specific bearing on the transaction at issue.

14           THE COURT:  Well, in your papers, Mr. Crowe, you

15   point out there's been three approaches typically taken by

16   the courts when an issue of this matter is raised.  I think

17   it's clear, though, the Seventh Circuit requires a showing of

18   bad faith, does it not?

19           MR. CROWE:  Yeah, I believe it does, your Honor.

20           THE COURT:  All right.

21           I'm not in a position to rule if you're really at

22   issue on this matter right now.  I just read it for the first

23   time prior to preparing for this hearing -- as I was

24   preparing for this hearing.

25           Do you think -- do you have -- you indicated that

1  you might have an agreement that might obviate the need to
2  address that or --

3       MS. JENKINS:  Well, I think many of the issues
4  raised by the suppression hearing -- by the suppression
5  motion, excuse me, have been narrowed substantially.  I think
6  that we can discuss that with your Honor prior to calling our
7  first witness.  But I think the only issue here is probable
8  cause, whether or not there was probable cause to believe
9  that it was the defendant who participated in a series of
10 activities on a particular day.

11      I'm happy to ask the witness, Special Agent
12 Durante, the questions necessary in order to establish
13 probable cause, but, of course, the challenge that the
14 defendant himself raises is identity.  And, of course, you
15 know, I -- I think that there is absolutely no good faith
16 basis to -- let me put it another way:  If the defendant is
17 arguing that it wasn't him, then the government certainly can
18 offer all the ways in which the agents and certainly the
19 under -- the cooperating source were able to identify him.

20      I really don't -- there was certainly no bad faith,
21 but I don't think you can raise identity as an issue and
22 then, in the context of a suppression hearing, suppress the
23 ways in which the agent would testify he was able to know
24 that the Eric being referred to was the defendant, Eric
25 Dillard.

1           THE COURT:  Well, Mr. Crowe in his papers says that

2   he had prepared a line of -- prepared a theory of his --

3   regarding his motion to suppress, including cross-examination

4   of the witnesses, and that when he saw this new information

5   it disturbed or somehow interrupted your theory and caused it

6   to change.

7           The case law -- and I haven't had a chance -- I'm

8   relatively familiar with this issue from my own past

9   experience, but the case law seems to say that absent a

10  showing of bad faith, that the obvious solution is to just

11  grant a continuance so the defense lawyer claiming surprise

12  has a chance to prepare.

13          Are you persisting in that theory, Mr. Crowe?

14          MR. CROWE:  I say this with much regret as a former

15  Assistant U.S. Attorney but, yes, I am.

16          And I think, as I set forth in my motion, there's

17  fairly strong facts in support of it insofar as the agent,

18  Special Agent Eric Durante, who was the lead agent in Mr.

19  Dillard's investigation.  And he's the one who signs off on

20  all the reports.

21          I'm going to elicit testimony.  There's -- in all

22  the DEA reports there's a Box 5 and it says "by colon."  In

23  every single one of those the "by" is SA Eric Durante.

24          And the same is true in the King case.  He was the

25  author in box 5, where it says "by", of every single report

1    in the King case.

2            Ms. Jenkins, who is the prosecutor obviously in

3    this case, was also the lead prosecutor -- one of two

4    prosecutors in the King case.

5            So as I set forth in my motion, she -- King was a

6    major trafficker.  I don't think there's any dispute about

7    that.  And she would have known what the evidence was against

8    him --

9            THE COURT:  We've got a really busy afternoon here.

10            MR. CROWE:  Okay.

11            THE COURT:  We've got a jury that has to be

12    instructed further.

13            What I'm driving at is this:  I don't at this point

14    have the wherewithal to rule as to whether or not your motion

15    should be granted.

16            And then secondly, if it is to be granted, then --

17    if it's to be denied, then the next consideration is, would

18    you need additional time to prepare.  And I take it your

19    answer to that would be yes?

20            MR. CROWE:  Well, your Honor, I -- I have prepared

21    both ways.

22            THE COURT:  I see.  Okay.

23            MR. CROWE:  I prepared -- if the Court were to rule

24    and grant my motion, I'm prepared to go forward with my

25    original line of examination.  I'm also prepared -- I did my

1    best to make adjustments, so I am prepared to go today.

2              THE COURT:  All right.  So you are prepared.

3              What about doing this:  What about conducting a

4    hearing, and I will then take under advisement not only the

5    merits of your motion but the merits of your motion to

6    disregard, or keep out, certain pieces of information that's

7    produced based --

8              MR. CROWE:  That seems like a Solomonic resolution

9    to me, your Honor.

10             THE COURT:  Does that mean it's good or bad?

11             MR. CROWE:  That's good.

12             THE COURT:  Ms. Jenkins, is that okay with you?

13             MS. JENKINS:  That's fine with me.

14             As I have expressed to Mr. Crowe, this is the

15   second time the government has made arrangements for Mr.

16   Durante to travel back to Chicago.  So our preference

17   obviously would be to proceed with his testimony so we do not

18   have to do that again.

19             THE COURT:  Why don't we do this then:  Why don't

20   you put on your hearing and introduce everything you were

21   going to introduce.  You can, at the appropriate time, object

22   and we'll consider it either substantive evidence or an offer

23   of proof.

24             After the hearing you can submit written authority

25   for the proposition that the motion to suppress should be

1    granted as well as what I should disregard because you think

2    it's a violation of Brady, as near as I can tell, or Giglio.

3              MS. JENKINS:  And, your Honor, that's actually the

4    point I would like to make.  It's not Brady because it's not

5    exculpatory in any way.  In fact, all the information is

6    incriminating.

7              THE COURT:  I can't know that yet.  I mean, you all

8    -- Mr. Crowe has a different idea of it.

9              MR. CROWE:  My theory is it's a violation of Rule

10   16.

11             THE COURT:  I found out that if I were clairvoyant

12   I could do this job a lot better.

13             So we're going to take this jury instruction and

14   then we'll begin the hearing.  Fair enough?

15             MR. CROWE:  Thank you, your Honor.

16             MS. JENKINS:  Thank you, your Honor.

17        (Brief recess was taken.)

18             THE CLERK:  13 CR 442, United States versus Eric

19   Dillard.

20             THE COURT:  There's the additional issue regarding

21   impeachment by the material that was developed in a

22   proceeding before Judge Kennelly.  And, Mr. Crowe, you

23   responded you had no intention to go into that if certain

24   conditions were met.

25             MR. CROWE:  Yes, your Honor.

1          THE COURT:  Have you discussed that further?

2          MS. JENKINS:  We have, your Honor.

3          We're in agreement -- as a preliminary matter --

4    and I would like to just put a few things on the record about

5    what the parties are in agreement on.

6          But we will not be calling Special Agent Warren in

7    light of the narrowing of certain issues.  So I think the

8    issue is moot as to whether or not impeachment can be

9    addressed at this hearing.

10          But, in any event, the parties did agree that the

11   government wouldn't elicit testimony from Special Agent

12   Warren concerning accolades.  And, conversely, Mr. Crowe

13   would not elicit certain testimony concerning the prior

14   ruling by Judge Kennelly.  So I think that issue is moot.

15          THE COURT:  Do you agree, Mr. Crowe?

16          MR. CROWE:  Yes, I do, your Honor.  Provided he's

17   not testifying, there's no need for a ruling or further

18   attention to it.

19          THE COURT:  That's an interesting issue.

20          Okay.  Are you ready to proceed?

21          MR. CROWE:  Yes, your Honor.

22          MS. JENKINS:  We are.

23          Before we call our first witness, I think -- and

24   the government, I believe, will have only one witness.  I

25   think the parties can agree to certain facts which will

1    narrow the scope of the hearing today, some of which is

2    addressed in the briefing but some of which has been further

3    clarified in light of conversation with counsel.

4         I believe the parties are in agreement about the

5    following things, and I'll ask Mr. Crowe to confirm.

6         The parties are in agreement that the defendant was

7    advised of his Miranda rights following his detention, and

8    that he voluntarily agreed to speak with agents but refused

9    to sign a written Miranda waiver form.

10        I do not believe that Mr. Crowe is contending that

11   Mr. Dillard refused to speak with agents, only that he

12   refused to sign the written Miranda waiver form that was

13   presented to him in connection with his detention.

14             THE COURT:  So agreed, Mr. Crowe?

15             MR. CROWE:  Yes, your Honor.

16             THE COURT:  Okay.

17             Ms. Jenkins?

18             MS. JENKINS:  The parties also agree that the

19   defendant voluntarily signed a written consent to search

20   form -- his signature appears on that form -- following his

21   detention on the evening of May 26th or early in the morning

22   of May 26th, 2008, and obviously certain materials were

23   recovered from his business.  But I do not believe that there

24   is any contention that the defendant did not voluntarily sign

25   the written consent to search form that was placed before

1    him.

2              MR. CROWE:  That is also correct, your Honor.

3              THE COURT:  Very well.

4              MS. JENKINS:  The parties are also in agreement

5    that on the evening of May 26th, 2008, that DEA arranged for

6    a canine or drug detection dog to conduct a perimeter search

7    around the outside of the Mercury Mountaineer that's at issue

8    in this case and that the dog alerted to the presence of

9    narcotics within that vehicle.

10             There are remaining issues that I think Mr. Crowe

11   would like to address with regard to the subsequent search,

12   but I don't think he's disputing that the agents did, through

13   the canine alert -- that the canine did alert to the presence

14   of narcotics within that vehicle.

15             THE COURT:  And what was that date again?

16             MS. JENKINS:  May 26th, 2008.

17             THE COURT:  Do you agree, Mr. Crowe?

18             MR. CROWE:  Yes, your Honor.  I do not dispute that

19   the canine did alert when sniffing around the exterior of the

20   blue Mercury Mountaineer.  I believe that we disagree to

21   whether or not that alert by itself constitutes probable

22   cause to search the vehicle.

23             THE COURT:  All right.

24             Anything further, Ms. Jenkins?

25             MS. JENKINS:  I think the only other issue -- and I

1  don't believe that there's any dispute that the Mercury
2  Mountaineer was not registered to the defendant.  I don't
3  remember if we specifically discussed this yesterday or on
4  other occasions, but I don't think that there's any dispute
5  that the Mercury Mountaineer was not registered to the
6  defendant.

7        MR. CROWE:  We had not discussed it, but it is my
8  understanding as well, so I do so stipulate.

9        MS. JENKINS:  So I think from the government's
10  perspective, what that leaves then is whether or not the
11  government can establish probable cause in the events during
12  the evening of May 26th, 2008.  And I think those -- that
13  relates specifically to the identity issue, the identity of
14  the defendant.

15        The government is prepared to call Special Agent
16  Eric Durante to testify to information he learned that
17  evening and throughout the course of the night in order to
18  establish probable cause.  We were not going to elicit
19  testimony from him that gets to the stipulated issues because
20  it seems that those things can be resolved on the briefs.

21        I will note, as I've discussed with counsel, there
22  is a portion of the audio recording made by the cooperating
23  source, Vincent Howard, which from a suppression hearing
24  standpoint the government believes would certainly buttress
25  Special Agent Eric Durante's testimony about the identity of

1    the defendant.

2         I have provided that material to Mr. Crowe.

3    Portions of that recording could be played, depending on

4    where your Honor comes out on the probable cause issue.

5         I can certainly play it in connection with Mr.

6    Durante's testimony or I can wait until other witnesses are

7    called.  And if your Honor believes that you would like to

8    hear portions of the recording, we can do that.

9         THE COURT:  Why don't you assume that I will not

10   make a ruling today and put everything in that has to be put

11   in?

12        MS. JENKINS:  Okay.  If that is the case, then the

13   government would -- and I raise this because Mr. Crowe had

14   previously made a reference at the last status hearing that

15   he would move to suppress certain portions of the recording.

16        But in light of the fact that your Honor would take

17   briefing on the issue, or at least not rule today, then at

18   the appropriate time during Mr. Durante's testimony the

19   government would offer a short clip, not the entirety of the

20   recording but a portion of the recording that was made by

21   Vincent Howard, who is the cooperating source in this case,

22   in which he placed a call to Special Agent Durante and

23   relayed information about the defendant, what the defendant

24   was doing, the vehicle that the defendant was driving and the

25   movements that were being made from one location to another.

1          And I put that on the record because I know that

2    Mr. Crowe had previously indicated that he had some objection

3    to the use of that recording.

4          THE COURT:  You're all way ahead of me here now

5    regarding these facts.

6          Let me ask you to do this:  Put in anything you

7    think might support the government's position that the motion

8    to suppress would be denied, even if there's some sequential

9    evidence that would only be operative if I didn't make a

10   decision as to something.  Put all of that in.

11         And, Mr. Crowe, I'll ask you to object and state

12   the grounds for your objection to any information that's

13   being offered, whether it's your -- the grounds are in that

14   memo, that you think this material wasn't timely produced to

15   you, or other grounds.  And then we'll take your objection

16   under advisement.

17         If your objections are overruled, it will be

18   considered substantive evidence regarding the motion to

19   suppress.  If your objections are sustained, that information

20   will stand in the record as an offer of proof.

21         MR. CROWE:  That's fine, your Honor, just --

22   provided that I am clear, that the Court understands, that I

23   can state the objections I have to the CD-ROM of the

24   communications between Howard -- Howard --

25         THE COURT:  Why don't I ask you to do it at the

1    time --

2            MR. CROWE:  All right.  I'll make a speaking

3    objection, if that's agreeable.

4            THE COURT:  Yes, you can do it at the time.  And

5    then I will ask you to address that in your papers after all

6    the proofs are in.

7            MR. CROWE:  That's fine, your Honor.  Thank you.

8            THE COURT:  Okay.

9            Mr. Fayhee, are you agreeing with all this?

10           MR. FAYHEE:  Pardon me?

11           THE COURT:  Do you agree with all this?

12           MR. FAYHEE:  I'm in absolute agreement.

13           MR. CROWE:  And one additional matter.  Ms. Jenkins

14   initially told me that she was also -- she's going to call --

15   it started out with three witnesses, then it went down to

16   two, with the second one being a Chicago Police Department

17   sergeant by the name of Dwayne Johnson, who is part of the

18   surveillance team.  So I prepared a cross-examination for

19   him.

20           And then today Ms. Jenkins advised me that she does

21   not intend to call him.  I initially said that's fine, and

22   then I thought about it for five minutes.  Then I called Ms.

23   Jenkins right back and said, no, I do want him to be here,

24   and if you're not going to call him, I want to call him.  So

25   I think Ms. Jenkins is not going to call Sergeant Dwayne

1    Johnson, but I will.

2            THE COURT:  Is he available, Ms. Jenkins?

3            MS. JENKINS:  We have continued to make him

4    available.  He's here and sitting outside the courtroom.

5            THE COURT:  All right.

6            Is there a motion to exclude witnesses?

7            MS. JENKINS:  We've asked Sergeant Johnson to sit

8    outside, so we'll just do that.  That's fine.

9            THE COURT:  Okay.  So you anticipate offering two

10   witnesses?

11           MS. JENKINS:  I think between the two parties --

12           THE COURT:  You're going to offer a witness, you'll

13   cross-examine, and then you're going to offer Sergeant

14   Johnson?

15           MR. CROWE:  Yes, your Honor.

16           I also will ask permission now to treat him as a

17   hostile witness and be able to cross -- ask him

18   cross-examination based questions.

19           THE COURT:  Any objection to that, Ms. Jenkins?

20           MS. JENKINS:  No.

21           THE COURT:  Very well.

22           MR. CROWE:  Thank you, your Honor.

23           THE COURT:  Okay.

24           Call your first witness, please.

25           MS. JENKINS:  The government will call Special

Durante - direct

```
 1    Agent Eric Durante.
 2              THE COURT:  Agent, would you step up here, please.
 3         ERIC DURANTE, GOVERNMENT'S WITNESS, DULY SWORN
 4              MS. JENKINS:  I'm actually hoping to get a little
 5    bit of help with the ELMO so that the --
 6              THE COURT:  You need the -- okay.
 7              MS. JENKINS:  -- agent will eventually be able to
 8    see --
 9              THE COURT:  I can tell you right now the lens is
10    pointed improperly on the ELMO, Ms. Jenkins.
11              MS. JENKINS:  And if you could just bear with me
12    one moment, your Honor.
13              THE COURT:  Take your time.
14         (Brief pause.)
15              THE COURT:  Do you want to state your name and
16    spell your last name for the record?
17              THE WITNESS:  Yes, sir.
18              Eric Durante, D-U-R-A-N-T-E.
19              THE COURT:  Thank you.
20              THE WITNESS:  You're welcome.
21                        DIRECT EXAMINATION
22    BY MS. JENKINS:
23    Q.   Good afternoon, Special Agent Durante.
24              Where are you currently employed?
25    A.   With DEA in Nassau, the Bahamas.
```

Durante - direct

1   Q.   What is your title, sir?
2   A.   Special Agent.
3   Q.   How long have you been a Special Agent with DEA?
4   A.   Approximately ten-and-a-half years.
5   Q.   And you indicated that you're currently assigned to the
6   Nassau office?
7   A.   Yes, I am.
8   Q.   How long have you been assigned to the Nassau office?
9   A.   Approximately four years.
10  Q.   Prior to the Nassau office where was your assignment?
11  A.   Chicago Field Division.
12  Q.   And during what years did you work as a Special Agent in
13  Chicago?
14  A.   From 2004 to 2010.
15  Q.   Prior to becoming a Special Agent did you work in law
16  enforcement?
17  A.   Yes, I did.
18  Q.   What did you do?
19  A.   I was a police officer in the State of Arizona for
20  approximately six years.
21  Q.   Prior to becoming a Special Agent, did you receive any
22  training in order to receive that title?
23  A.   Yes, I did.
24  Q.   And can you just generally describe the training you
25  would have received?

1    A.    Approximately four months in Quantico, training on

2    long-term investigations, making arrests, dealing with

3    confidential sources, tactical training, firearms --

4    Q.    During your time --

5    A.    -- handling of evidence.

6    Q.    I apologize.

7    A.    -- handling of evidence, so forth.

8    Q.    Thank you.

9          During your time with the Chicago Field Division of

10   DEA, what were your general responsibilities and duties?

11   A.    Long-term investigation, enforcing criminal code,

12   federal code, drug codes, dealing with confidential sources,

13   dealing with confidential -- or cooperating defendants,

14   handling evidence, making cases, running wire investigations,

15   a number of other things as well.

16   Q.    Sir, I would like to turn your attention to 2008.  Were

17   you working as a Special Agent in Chicago in that year?

18   A.    Yes, I was.

19   Q.    During that period were you involved in Chicago's --

20   were you involved in DEA's investigation into an individual

21   named Michael King?

22   A.    Yes, I was.

23   Q.    What kind of investigation were you conducting into

24   Mr. King?

25   A.    I was the case agent on that investigation.  It was a

1   large scale cocaine narcotics investigation on Mr. King and

2   his drug trafficking organization.

3   Q.   Over the course of the drug investigation into Mr. King

4   did you have occasion to work with any cooperating

5   individuals?

6   A.   Yes, I did, numerous ones.

7   Q.   Did you have an occasion to work with an individual

8   named Vincent Howard?

9   A.   Yes, I did.

10  Q.   Approximately when did Mr. Howard begin cooperating with

11  DEA?

12  A.   Early 2008.

13  Q.   As a part of Mr. Howard's cooperation did you meet with

14  him in person?

15  A.   Yes, I did, on numerous occasions.

16  Q.   Did you debrief Mr. Howard generally about his

17  relationship with Mr. King?

18  A.   Yes, I did.

19  Q.   And did you debrief Mr. Howard about other people who

20  worked in Mr. King's drug operation?

21  A.   Yes, I did.

22  Q.   Based on your debriefs of Mr. Howard, what was your

23  understanding of Howard's role in King's drug organization?

24  A.   Howard was a transporter and a wholesale supplier of a

25  kilogram of cocaine that he received from Mr. King.  And then

1    he would -- he traveled down -- he traveled down to Kentucky

2    to sell cocaine that he had received from Mr. King and then

3    he would travel back to Chicago to bring the proceeds of the

4    sales to him.

5    Q.   Why was Mr. Howard cooperating with law enforcement in

6    2008?

7    A.   For his benefit, to hope -- in hopes that he receive a

8    lighter sentence from the U.S. Government.

9    Q.   At the time you began working with Mr. Howard as a

10   cooperator, were any promises made to him at that time about

11   any consideration that he might receive?

12   A.   No, there were not.

13   Q.   As a part of Mr. Howard's cooperation, what did he agree

14   to do?

15   A.   He agreed to gather evidence against Mr. King and other

16   co-conspirators of Mr. King concerning the drug trafficking

17   organization that Mr. King was running, to include recorded

18   phone calls and participating in cocaine transactions.

19   Q.   You mentioned that Mr. Howard agreed to make recordings

20   as a part of his cooperation, is that correct?

21   A.   Yes, he did.

22   Q.   What, if anything, did you provide with Mr. Howard --

23   provide Mr. Howard in order to assist him with making those

24   recordings?

25   A.   I gave him a digital recorder, as I do with most of my

Durante - direct

1    cooperators, to record phone calls that come in or that he

2    places when I'm not available or around.

3    Q.   So is it fair to say that Mr. Howard made recordings

4    when you were not present?

5    A.   Yes, he did.

6    Q.   What did Mr. Howard do with those recordings after he

7    made them?

8    A.   After he made them he would collect them altogether,

9    keep them on the digital recorder, and then when I would see

10   him and debrief him, he would turn them over to me, at which

11   time I would collect them and place them into evidence.

12   Q.   Is it fair to say that Mr. Howard made a series of

13   recordings over several months?  Is that fair to say?

14   A.   Yes, it is.

15   Q.   I would like to direct your attention to May 2008.  Were

16   you working with Mr. Howard at that time?

17   A.   I'm sorry, what date?

18   Q.   In May of 2008 --

19   A.   Yes, I was.

20   Q.   -- were you working with Mr. Howard at that time?

21   A.   Yes, I was.

22   Q.   Had he been providing you information about King's drug

23   trafficking activities as of May 2008?

24   A.   Yes, he had been.

25   Q.   Had you been able to corroborate some of the information

1   that Mr. Howard had been providing you over the course of his

2   cooperation?

3   A.   Yes.  I was able to corroborate a number of people that

4   he said were involved with the organization, a number of

5   vehicles that he said was involved in the organization.  And

6   then I was able to listen to some of the phone calls he

7   provided that indicated that Michael King was running a large

8   scale drug trafficking organization.

9   Q.   Sir, I would like to direct your attention specifically

10   to May 26th, 2008.  Were you working on that day?

11   A.   Yes, I was.

12   Q.   Was May 26th, 2008, the Memorial Day holiday?

13   A.   Yes, it was.

14   Q.   Did you develop an investigative plan for that

15   particular day using information obtained from Mr. Howard?

16   A.   Yes, I did.

17   Q.   And in general terms, what was the plan?

18   A.   Mr. Howard was supposed to go to Mr. King that day and

19   receive five kilograms of cocaine from him.

20   Q.   In advance of this operation did you and other members

21   of DEA meet with Mr. Howard?

22   A.   Yes, we did.

23   Q.   And did Howard place or receive any phone calls in

24   connection with this transaction?

25   A.   Yeah.  Earlier in the day he had talked to Mr. King and

Durante - direct

1   I think Mr. Claude McKay about the transaction.

2   Q.   Were you present when those phone calls were made or

3   received?

4   A.   No, I wasn't.

5   Q.   Were any of those phone calls recorded?

6   A.   Yes, some of them were.

7   Q.   As a result of the telephone calls what did Mr. Howard

8   agree to do?

9   A.   Mr. Howard agreed to meet with DEA agents and to

10  participate in the transaction with DEA to pick up the five

11  kilograms of cocaine from Mr. King.

12  Q.   Where was Mr. Howard going to go in order to begin this

13  particular transaction?

14  A.   He had told me he -- Mr. King advised him to meet him at

15  Claude McKay's residence in Hyde Park.

16  Q.   And just to be clear, what kind of drug did Howard relay

17  that he was expecting to receive?

18  A.   Five kilograms of cocaine.

19  Q.   And what -- you said five kilograms of cocaine?

20  A.   Yes, ma'am.

21  Q.   Thank you.

22          THE COURT:  What was that?  You referred to

23  something specific in Hyde Park.  Was that a location or

24  something?

25          THE WITNESS:  Yes, sir.  Mr. Claude McKay's

Durante - direct

 1   residence in Hyde Park.
 2            THE COURT:  Okay.
 3   BY MS. JENKINS:
 4   Q.   I would like to direct your attention to the address 924
 5   East Hyde Park Boulevard in Chicago.  Are you familiar with
 6   that location?
 7   A.   Yes, I am.
 8   Q.   And over the course of your investigation did you have
 9   occasion to participate in surveillance outside of that
10   location?
11   A.   Yes, I did.
12   Q.   I would like to show you what's in front of you, I
13   believe, which is marked as Government Exhibit Map 1.  Do you
14   recognize that?
15   A.   Yes, I do.
16   Q.   What is that?
17   A.   That's a picture of the front of the residence of 924
18   and 926 in Hyde Park.
19   Q.   Does it fairly and accurately depict the residence
20   outside of 924 East Hyde Park in Chicago?
21   A.   Yes, it does.
22            MS. JENKINS:  And at this time, your Honor, the
23   government would move to admit -- and it's already
24   published -- but move to admit Government Exhibit Map 1.
25            THE COURT:  Mr. Crowe, any objection?

Durante - direct

```
 1              MR. CROWE:  No, your Honor.
 2              THE COURT:  That's admitted.
 3         (Said exhibit was received into evidence.)
 4    BY MS. JENKINS:
 5    Q.   And, Special Agent Durante, is it fair to say that this
 6    is a multi-unit building?
 7    A.   Yes, it is.
 8    Q.   And aside from 924 East Hyde Park, does this structure
 9    also contain any other residential street address?
10    A.   926, and I think there might be another one but -- 924,
11    926 that picture shows.
12    Q.   And does there also appear to be a shared gate for this
13    residence?
14    A.   Yes, it does.
15    Q.   Was this the first meeting location for the evening on
16    May 26th of 2008 for the transaction?
17    A.   Yes, it was.
18    Q.   What was your understanding as the purpose -- was the
19    purpose for Mr. Howard to go to this particular address?
20    A.   To meet with Michael King and Claude McKay to take part
21    in a transaction to pick up five kilograms of cocaine.
22    Q.   How did Mr. Howard relocate to this residence?
23    A.   By an undercover vehicle that we had previously provided
24    him.
25    Q.   When you say undercover vehicle, can you just explain
```

Durante - direct

1    what that means in this context?

2    A.    Yes.  We had previously -- before we went to this

3    address we met in a predetermined location, which we -- at

4    that time we provided him with an undercover vehicle; it has

5    a trap in it.  It's a UC vehicle, one of our vehicles that we

6    use to --

7    Q.    And when you say a trap, do you mean a hidden

8    compartment?

9    A.    Yes, a hidden compartment.

10    Q.    Okay.

11          Was Mr. Howard searched before he was relocated --

12    before he relocated to this address?

13    A.    Yes.  At the predetermined location we searched him, we

14    searched the vehicle for contraband and negative results.  We

15    also provided him with a recording device -- transmitter and

16    a recording device.

17    Q.    So was -- let's take those one by one.

18          First, you said he was provided with a recording

19    device, is that correct?

20    A.    Yes.

21    Q.    Was that device concealed on him in any way?

22    A.    Yes, it was.

23    Q.    Was that device an audio only recording or was there

24    also a video capability on that recording?

25    A.    Only audio.

Durante - direct

1    Q.   Was he also provided with a transmitter?

2    A.   The same device.

3    Q.   And what does a transmitter allow you to do?

4    A.   To hear conversations that he's having with targets of

5    interest.

6    Q.   Were you able to communicate with Howard in any other

7    way aside from the transmitter that you just mentioned?

8    A.   Yes, by cell phone.

9    Q.   And who activated and deactivated the recording devices

10   that Mr. Howard was wearing?

11   A.   I did.

12   Q.   At some point on May 26th, 2008, were you stationed

13   outside of the residence at 924 East Hyde Park?

14   A.   Yes, I was.

15   Q.   Approximately when did you arrive?

16   A.   Approximately -- sometime after 9:00.  We --

17        MR. CROWE:  May I have a brief moment to approach

18   and confer with the prosecutor?

19        THE COURT:  Sure.

20        (Discussion had off the record.)

21        MR. CROWE:  Thank you, your Honor.

22   BY MS. JENKINS:

23   Q.   The East Hyde Park Boulevard address, the --

24        MS. JENKINS:  I apologize, your Honor.  One moment.

25        (Brief pause.)

 1   BY MS. JENKINS:

 2   Q.   At some point on May 26th did you become stationed

 3   outside of the East Hyde Park residence?

 4   A.   Yes, I was.

 5   Q.   And was anyone else with you in your car?

 6   A.   Yes, Randy Panaca.  He's a police officer from LaGrange.

 7           THE COURT:  Say that name again, please.

 8           THE WITNESS:  It's Randy, his first name, and his

 9   last name -- I'm going to butcher this but I think it's

10   Panaca, P-A-N-A-C-A, if possible.

11           THE COURT:  P-A-N-A-C-A?

12           And he's a Chicago policemen?

13           THE WITNESS:  No, sir.  He works for LaGrange

14   Police Department.

15           THE COURT:  I see.

16   BY MS. JENKINS:

17   Q.   Sir, were you working with a team of agents that

18   evening?

19   A.   Yes, I was.

20   Q.   And approximately how many others were stationed or

21   assisting with your operation that night?

22   A.   We had approximately eight others total.

23   Q.   I am showing you -- well, actually, let me ask you this:

24   When you positioned yourself -- when you arrived at that

25   location, did you position yourself in a way that you could

Durante - direct

1    see the front entrance of the building?

2    A.    No, I did not.

3    Q.    Okay.  Where were you generally located in terms of

4    distance?

5    A.    Within the block.  I don't recall -- recall exactly

6    where I was, but I was not in front of the residence.  Within

7    the block or so.

8    Q.    Was anyone else from your team positioned to see the

9    front of that residence?

10   A.    Yes, there was.

11   Q.    Who?

12   A.    Task Force Officer Dwayne Johnson.

13   Q.    And were you able to communicate with Task Force Officer

14   Johnson?

15   A.    Yes, I was, by radio.

16   Q.    Okay.  When you arrived at that location was it dark

17   outside?

18   A.    Yes, it was.

19   Q.    And were you able to see through any other artificial

20   lighting conditions?

21   A.    There's some artificial lighting.  It's a normal

22   neighborhood, lit artificially.

23   Q.    When you positioned yourself on surveillance outside of

24   the residence, what did -- what did you do while Mr. -- let

25   me back up and ask a better question.

1          At some point did you become aware that Mr. Howard

2    had arrived in the area?

3    A.   Yes.  It was communicated to me -- we were on -- we

4    maintained surveillance on Mr. Howard from our meet location

5    to the house.

6    Q.   And while Mr. Howard -- did Mr. Howard eventually go

7    into the residence on East Hyde Park?

8    A.   Yes, he did.

9    Q.   And what did you do during that time?

10   A.   Just waited in my car.

11   Q.   At some point did you learn that Mr. Howard had left the

12   residence?

13   A.   Yes.  Mr. Johnson communicated that to me.

14   Q.   Okay.  Approximately how long would you estimate that

15   Mr. Howard was inside of the residence?

16   A.   15 to 20 minutes.

17   Q.   Okay.  And how did you learn that?

18   A.   It was communicated to me by radio by Mr. Johnson.

19   Q.   Could you see Mr. Howard when he left that residence

20   from your position in your vehicle?

21   A.   No, I could not.

22   Q.   Okay.  Could you see whether or not Mr. Howard was with

23   anyone when he left -- when he left the building after the

24   call-out that you received?

25   A.   No, I could not visually see that, no.

Durante - direct

 1   Q.   Following Mr. Howard's departure from the residence did

 2   you speak with him?

 3   A.   Yes, I did.  He called me on the cell phone.

 4   Q.   Can you estimate approximately how long after you

 5   learned that Mr. Howard had left the building that you spoke

 6   to Mr. -- Mr. Howard by telephone -- by cell phone?

 7   A.   One or two minutes, walking distance from when he left

 8   the residence to when he got into his vehicle, the undercover

 9   vehicle.

10   Q.   When you spoke to Mr. Howard where was he?

11   A.   He just entered into his vehicle -- into the undercover

12   vehicle.

13          MS. JENKINS:  And at this time, your Honor, the

14   government would propose, in light of your ruling in terms of

15   offering all the evidence, about a two-minute clip of a

16   portion of the recording that Mr. Howard made that would

17   specifically cover the telephone call that Special Agent

18   Durante is currently testifying about.  And I believe counsel

19   has an objection to that.

20          THE COURT:  All right.  How are you identifying

21   that exhibit?

22          MS. JENKINS:  At this time, your Honor, the

23   government would refer to the recording as Government Exhibit

24   Audio Recording.

25          THE COURT:  Mr. Crowe, you have an objection to

Durante - direct

1    that?

2              MR. CROWE:  Well, your Honor, what I discussed with

3    Ms. Jenkins was that I had -- that the agent would testify --

4    I had no objection to him testifying about telephone

5    communications he had with the informant, Vincent Todd

6    Howard.  So that's what I suggest we do.  I don't see any

7    need to play the tape-recording.  If something -- if it's a

8    telephone call that the agent was a participant on, he can

9    just directly testify to it.

10             MS. JENKINS:  And I think the issue here, your

11   Honor, is that based on your prior statements at the

12   beginning of the hearing, you suggested that the government

13   offer -- assume that no ruling would be made today, and then

14   offer all forms of proof that it would eventually elicit in

15   any form or fashion so that we don't have to revisit the

16   issue.

17             Traditionally I would not play the recording, but

18   in light of the fact that probable cause and identity is the

19   issue --

20             THE COURT:  I think what Mr. Crowe is saying is he

21   has no objection to the agent simply testifying what was said

22   during the conversation.

23             MS. JENKINS:  And normally I would not have an

24   objection to that, but because identity is such an important

25   issue, and because portions of what is said on the recording

1   will certainly corroborate Special Agent Durante's

2   testimony -- and he can certainly identify what was being

3   relayed to him in terms of the identity of the defendant, the

4   vehicle that was being driven.  Given that it's such a short

5   clip and it certainly would not be the entirety of the

6   recording, and because identity really is the central issue,

7   the government would offer a short --

8            THE COURT:  All right.

9            You don't have an evidentiary objection to it,

10  Mr. Crowe, I take it?

11           MR. CROWE:  Well, what I would object is that -- I

12  don't dispute that the informant, Todd Vincent Howard, made

13  the statements on the phone to the agent that are

14  attributable to him.  I do contest the truthfulness of those

15  --

16           THE COURT:  Well, you can do that.  But you have no

17  objection to the foundation, I take it?

18           MR. CROWE:  No.

19           THE COURT:  All right.

20           Okay.  The exhibit is admitted and may be published

21  to the Court.

22           And you, Mr. Crowe, the defense, maintains an

23  objection as to the admissibility of it based on lack of

24  credibility, lack of truthfulness, is that right?

25           MR. CROWE:  Well, and --

Durante - direct

```
 1              THE COURT:  I'm trying to move this -- I think
 2   we're spending more time trying to move it along than we
 3   would if we just put the proofs --
 4              MR. CROWE:  There's just one point of clarification
 5   I would make, and that's the recording spans a matter of
 6   hours; it really covers the entire evening.  Some of it are
 7   phone calls between the --
 8              THE COURT:  Hold it.  Wait.  Ms. Jenkins just
 9   represented she's going to play a snippet of that.  How long
10   is this?
11              MS. JENKINS:  Less than two minutes.
12              THE COURT:  What's it going to say?
13              MS. JENKINS:  It's going to be -- from about
14   21 minutes in it's going to be Mr. Howard's telephone call to
15   Special Agent Durante indicating that he's leaving the Hyde
16   Park residence and heading to the next location and
17   identifying the defendant in a vehicle.
18              THE COURT:  Do you have an objection to the
19   foundation of that?
20              MR. CROWE:  No, your Honor.
21              THE COURT:  Do you have an objection otherwise
22   regarding substantive evidence, any rule of evidence --
23              MR. CROWE:  No.
24              THE COURT:  Okay.  You may play it.
25              MS. JENKINS:  Thank you.
```

 1          (Brief pause.)

 2          MS. JENKINS:  Your Honor, I'm not aware of whether

 3   or not there's a -- I appear to be linked in, but I'm not

 4   sure if you can hear --

 5          THE COURT:  You cannot.  I've got the room volume

 6   up and the evidence volume --

 7          (Brief pause.)

 8          THE COURT:  Your office has been using the computer

 9   terminal at the prosecution table.

10          MS. JENKINS:  I'll try that.

11          THE COURT:  You want to try that?

12          (Brief pause.)

13          MS. JENKINS:  Your Honor, just for the record, to

14   be very clear, I am starting the recording at 21 minutes and

15   15 seconds.

16          THE COURT:  Thank you.

17          (Tape played.)

18          MS. JENKINS:  Thank you for your patience, your

19   Honor.

20   BY MS. JENKINS:

21   Q.   Special Agent Durante, were you able to hear the

22   recording that was just played from Government Exhibit Audio

23   Recording?

24   A.   Yes, I was.

25   Q.   Did you recognize the voices in that recording?

1    A.   Yes, as Vincent Howard.

2    Q.   And how do you recognize Mr. Howard's voice?

3    A.   I've been dealing with him since that time.  I've heard

4    him on the phone, talked to him in person as well.

5    Q.   Do you recall having that telephone conversation with

6    Mr. Howard shortly after he left the residence on Hyde Park?

7    A.   Yes, I do.

8    Q.   With regard to the content of what Mr. Howard relayed to

9    you, when he said he tried to say Eric was here, what Eric

10   did you understand him to be referring to?

11   A.   Eric Dillard.

12   Q.   And had you previously debriefed Mr. Howard concerning

13   anyone named Eric with regard to your investigation into

14   King's drug operation?

15   A.   Yes.  He identified -- identified him as Eric and E in

16   the past.

17   Q.   Okay.  Let me break that down just a little bit.

18        When did you debrief Mr. Howard about an Eric?

19   A.   Approximately a month prior to the transaction -- this

20   transaction.

21   Q.   So in April 2008?

22   A.   Early April 2008.

23   Q.   During the debrief with Mr. Howard did you show

24   Mr. Howard any photographs?

25   A.   Yes, I did, numerous ones.

1    Q.   Showing you on your overhead screen -- or in the screen
2    in front of you Government Exhibit Dillard Photo 2 -- do you
3    see that photo in front of you?
4    A.   Yes, I do.
5    Q.   Do you recognize that photograph?
6    A.   Yes, I do.
7    Q.   Did you show this photograph to Mr. Howard in April
8    of 2008 during your debrief?
9    A.   Yes, I did.
10   Q.   And what, if anything, or how, if any way, did
11   Mr. Howard identify this photograph?
12   A.   He just looked at it and said that's the guy he knew as
13   Eric or E.
14   Q.   During your debrief with Mr. Howard in April of 2008,
15   was Eric Dillard the only person that you debriefed
16   Mr. Howard about?
17   A.   No, he wasn't.
18   Q.   So getting back to the telephone conversation that we
19   were just talking about, when Mr. Howard stated to you on the
20   telephone that he tried texting to say Eric was here, did you
21   understand who -- who did you understand Mr. Howard to be
22   referring to?
23   A.   Eric Dillard.  That's the only Eric we talked about.
24            THE COURT:  Hold on one second, Ms. Jenkins.
25            (Brief pause.)

1    BY MS. JENKINS:

2    Q.   With regard to the photo that was just shown to you as

3    Government Exhibit Dillard Photo 2, do you see the person in

4    the courtroom today whose photograph you had previously shown

5    to Mr. Howard?

6    A.   Yes, I do.

7    Q.   And could you please identify him for the record by an

8    article of clothing that he's wearing today?

9    A.   Mr. Dillard is wearing a white Polo shirt, collared

10   shirt.

11   Q.   Did you -- so you had a conversation with Mr. Howard --

12              THE COURT:  Do you want the record to reflect that

13   in-court identification, Ms. Jenkins?

14              MS. JENKINS:  Thank you, your Honor.  I appreciate

15   that.

16              THE COURT:  The record will so reflect.

17              MS. JENKINS:  Thank you.

18   BY MS. JENKINS:

19   Q.   When the -- when Mr. Howard indicated to you that he

20   said that Eric was behind him in the Mountaineer, did you

21   have any understanding of what Mr. Howard was referring to?

22   A.   Yes.  He was telling me that Eric Dillard was following

23   him -- was following him in the Mountaineer, the Mercury

24   Mountaineer -- what he believed to be a Mercury Mountaineer.

25   Q.   I would like to focus on the remainder of your telephone

1   call with Mr. Howard following his departure from Hyde Park.

2           Did Howard relay specific information about where

3   he was going?

4   A.  Yes.  He said he was going to the garage, which we had

5   previously discussed before the transaction was to take place

6   at.

7   Q.  And what was the purpose of going to this parking

8   garage?

9   A.  To conduct the actual transaction of picking up the

10  cocaine.

11  Q.  And I believe we covered this, but did Mr. Howard relay

12  whether or not Eric was going to be accompanying him or

13  following him to that location?

14  A.  Yes.  He said he wanted to ride with him inside his --

15  inside the UC vehicle, but he told him not to ride with him.

16  He did that in part so he could communicate with me.

17  Q.  And so it was your understanding from Mr. Howard that

18  Mr. Dillard and Mr. Howard would travel to this parking

19  location -- parking garage in separate vehicles?

20  A.  Yes, and that Eric would be following him.

21  Q.  What was your understanding of why Mr. Howard and the

22  defendant were going to the parking garage?

23  A.  To conduct a transaction of -- to receive five kilograms

24  of cocaine.

25  Q.  And did Mr. Howard relay information to you about the

1   kind of car that the defendant was driving?

2   A.   Yes.  He said he believed it to be a blue Mountaineer.

3   Q.   Upon learning of this next meeting location, what did

4   you do?

5   A.   We maintained surveillance on the -- on Mr. Howard, and

6   then we also identified the Mercury Mountaineer, which we

7   identified on surveillance but we had previously identified

8   that vehicle a month prior as being involved in Mr. King's

9   organization.

10  Q.   Where were the undercover vehicle and the Mountaineer --

11  which direction were they headed -- or where were they

12  headed?

13  A.   I'm not sure what direction they left there, but they

14  were heading both from Hyde Park to that downtown garage, and

15  we followed them to that location.

16          THE COURT:  Hold on one second, Ms. Jenkins.  We're

17  off the record.

18          (Discussion had off the record.)

19          THE COURT:  Can I ask you all -- the jury has a

20  verdict in this case.

21          MS. JENKINS:  Sure.

22          THE COURT:  We're off the record.

23          (Discussion had off the record.)

24          (Brief recess was taken.)

25          THE COURT:  Okay.  Please be seated.

1      You may proceed, Ms. Jenkins.

2      MS. JENKINS:  Thank you.

3   BY MS. JENKINS:

4   Q.   Special Agent Durante, I think when we broke you were

5   discussing the plan for relocating to a parking garage, is

6   that correct?

7   A.   Yes, we were.

8   Q.   I am showing you what's been marked for identification

9   as Government Exhibit Map 3.  Do you recognize that

10  photograph?

11  A.   Yes, I do.

12  Q.   What is that?

13  A.   That's a picture of a parking garage on 8th Street.

14  Q.   Do you recognize that location?

15  A.   Yes, I do.

16  Q.   Did it have any significance to your operation that day?

17  A.   That's where we ended up, the CS Howard and conducting

18  the transaction with Dillard.

19  Q.   Did you personally travel to this location in your

20  vehicle?

21  A.   Yes, I did.  We maintained surveillance from -- on the

22  CS and the Mercury from the time it left Hyde Park to that

23  parking garage.

24  Q.   Now, you mentioned the Mercury.  Is this the same

25  Mercury that we heard referenced in the recording that we

1    just listened to?

2    A.   Yes, it is.

3    Q.   Was the Mercury following Mr. Howard in the undercover

4    vehicle?

5    A.   Yes, it was.

6    Q.   Were you able to see the license plate of the Mercury

7    Mountaineer after you identified it?

8    A.   Yes, I was.

9         MS. JENKINS:  I don't believe that I did but, your

10   Honor, the government would move to admit Government Exhibit

11   Map 3.

12        MR. CROWE:  No objection, your Honor.

13        THE COURT:  Very well.  That exhibit is admitted.

14      (Said exhibit was received into evidence.)

15   BY MS. JENKINS:

16   Q.   With regard to the Mercury Mountaineer, were you able to

17   see the license plate of that vehicle after you identified

18   it?

19   A.   Yes, ma'am, I was.

20   Q.   Showing you what has been marked for identification as

21   Government Exhibit License Plate, do you recognize this

22   photograph?

23   A.   Yes, I do.

24   Q.   What is it?

25   A.   That's the photograph -- the rear license plate of the

1    Mercury Mountaineer, the blue one that was following Howard

2    that night and the one we had previously identified before

3    that night as well.

4    Q.   Does it fairly and accurately identify or depict the

5    license plate that was on the Mercury Mountaineer that you

6    saw on May 26th, 2008?

7    A.   Yes, it does.

8         MS. JENKINS:  And the government would move to

9    admit Government Exhibit License Plate.

10        THE COURT:  Mr. Crowe?

11        MR. CROWE:  No objection.

12        THE COURT:  That's admitted.

13       (Said exhibit was received into evidence.)

14   BY MS. JENKINS:

15   Q.   As of May 26th, 2008, were you familiar with this

16   Mercury Mountaineer that was bearing this Kentucky license

17   plate?

18   A.   Yes, I was.

19   Q.   How?

20   A.   Mr. Howard identified it previously, and prior -- about

21   a month prior to this transaction we were able to conduct

22   surveillance on this Michael King that was driving this

23   Mercury at the time that he went to go get a trap, a hidden

24   compartment, installed in it.  We were able to follow him and

25   conduct surveillance on him at that time and -- while he was

1    driving this vehicle.

2    Q.    So as of May 26th, 2008, you were aware that a trap

3    compartment was located within this Mercury Mountaineer?

4    A.    Yes, I was aware there was a hidden compartment in it

5    and it was going to be used within the organization to

6    transport cocaine from Chicago to Kentucky.

7    Q.    In connection with your investigation had you and other

8    members of your team determined whether or not this vehicle

9    was registered to Eric Dillard?

10   A.    Yes.  It's not -- it is not registered to Eric Dillard.

11   Q.    After the vehicles arrived in the area of the parking

12   garage depicted in Government Exhibit Map 3, did you

13   eventually arrive in the area?

14   A.    Yes, I did.

15   Q.    And what did you do when you arrived there?

16   A.    I set up surveillance outside of the parking garage.

17   Q.    Were you able to see either Mr. Howard's vehicle or the

18   Mercury Mountaineer once they went inside the parking garage?

19   A.    No, we were not.

20   Q.    Were you eventually made aware of the fact that the

21   vehicles left the parking garage?

22   A.    Yes, I was.

23   Q.    Can you estimate about how long the vehicles were inside

24   the parking structure, based on your collective knowledge

25   from your fellow law enforcement?

1   A.   About five minutes -- five to ten minutes.

2   Q.   In addition to the Mountaineer and Mr. Howard's vehicle

3   leaving the garage, did any other vehicle of interest exit

4   that garage?

5   A.   Yes.  The maroon GMC SUV.

6   Q.   And how did you know that this maroon GMC was involved

7   in the transaction?

8   A.   It was -- I was told it was -- followed them outside of

9   the garage, and Howard communicated with me and told it --

10  told me it was involved with the transaction as well.

11  Q.   And did you have this conversation with Mr. Howard by

12  cell phone?

13  A.   Yes, I did.

14  Q.   What did Howard relate to you concerning his meeting

15  inside the garage once he departed the area -- or departed

16  the garage?

17  A.   He said he went up with Eric Dillard -- or Eric -- he

18  said he went up with Eric.  He -- Eric removed the duffle bag

19  from the Mountaineer trap location; it got stuck, he had a

20  hard time removing it, and proceeded to give that duffle bag

21  to the Hispanic male that was driving the GMC.

22           In return for giving him the duffle bag, which he

23  saw United States currency and both currency in, the Hispanic

24  male gave what he believed to be 25 kilograms of cocaine to

25  Eric Dillard, at which time Eric Dillard -- or, I'm sorry,

Durante - direct

1    Howard took seven kilograms of cocaine and Eric Dillard kept
2    the rest and put them inside the Mercury -- the trap location
3    inside the Mercury.
4    Q.   So Mr. Howard confirmed for you that he had seven
5    kilograms of cocaine with him in his vehicle?
6    A.   Yes.  He confirmed that he took seven and Eric took the
7    rest of them.
8    Q.   And what did Mr. Howard say that Eric did with the
9    remaining -- with the remaining kilograms of cocaine obtained
10   from the driver of the GMC?
11   A.   He said he had removed them from the duffle bag.  And he
12   also mentioned -- he was not wearing gloves, so he had made a
13   comment to him, You're not wearing gloves, because he took --
14   physically took them out of the duffle bag and put them
15   inside the trap that was located inside the Mercury, the
16   hidden compartment.
17   Q.   So was it your understanding, following your
18   conversation with Mr. Howard, that there were kilograms of
19   cocaine located within the Mercury Mountaineer?
20   A.   Yes.  We had a discussion about how many and he wasn't
21   sure.  We were going back and forth on the exact numbers, but
22   we -- we understood that there was the rest of the kilograms
23   inside the Mercury.
24   Q.   Once the -- once Mr. Howard left of the garage, where
25   did he go?

Durante - direct

1   A.   He exited the garage and was heading back to Hyde Park,
2   Claude McKay's residence.
3          THE COURT:  I'm sorry.  I didn't understand that.
4   Heading back to?
5          THE WITNESS:  To the original residence that he
6   started at in Hyde Park, which is Claude McKay's residence.
7          THE COURT:  The 926 residence?
8          THE WITNESS:  924, yes, sir.
9          THE COURT:  924.
10  BY MS. JENKINS:
11  Q.   Did you and other members of your team follow Mr. Howard
12  back to the East Hyde Park residence?
13  A.   Yes, we did.
14         We also attempted to follow the GMC and the
15  Mercury, which we lost sight of; we didn't have enough
16  manpower.  And we followed the -- Mr. Howard all the way from
17  the garage to -- back to the residence.
18  Q.   Did you eventually arrive back to the East Hyde Park
19  residence?
20  A.   Yes, I did.
21  Q.   This is the same residence that the transaction started
22  at?
23  A.   Yes, ma'am, it was.
24         THE COURT:  Do you mind if I ask a question?  I'm
25  not clear.

Durante - direct

1    You say you lost the maroon GMC and the other car.

2    Was that the Mountaineer?

3    THE WITNESS:  Yes, sir.  All three vehicles exited

4    the garage.  We --

5    THE COURT:  And you lost the Mountaineer and the

6    GMC?

7    THE WITNESS:  Yes.  I was trying to get a location

8    on the --

9    THE COURT:  I think you may have said you lost the

10   Mercury.

11   THE WITNESS:  Correct.

12   THE COURT:  The Mercury was Mr. Howard's car, and

13   you had that in view, didn't you?

14   THE WITNESS:  No, sir.  The Mercury Mountaineer is

15   the --

16   THE COURT:  Oh, I see.  Got it.

17   THE WITNESS:  -- the one that Eric Dillard was

18   driving.

19   THE COURT:  So the Mercury is a Mountaineer?

20   THE WITNESS:  Yes, sir.  I'm sorry.

21   THE COURT:  Got it.

22   BY MS. JENKINS:

23   Q.   And just to be clear, Mr. Howard exited the garage in

24   his vehicle, is that correct?

25   A.   Yes.  Yes, ma'am.

Durante - direct

1   Q.   The Mercury Mountaineer exited the garage, correct?

2   A.   Correct.

3   Q.   And the GMC that Mr. Howard had identified for you as

4   the car that these vehicles had met with, also exited the

5   garage, correct?

6   A.   Correct.

7            THE COURT:  Which two did you lose?

8            THE WITNESS:  The GMC, we maintained surveillance

9   on it for a short time and lost it.  The Mercury, I was

10  trying to obtain -- over the phone you'll hear on the

11  conversation where it was.  We lost that as well.

12           THE COURT:  Got it.

13  BY MS. JENKINS:

14  Q.   So the only car you were ultimately following back to

15  East Hyde Park is Mr. Howard in his undercover vehicle?

16  A.   Correct, ma'am.

17  Q.   Did you eventually arrive back to East Hyde Park?

18  A.   Yes, I did.

19  Q.   Did Mr. Howard eventually arrive back to East Hyde Park?

20  A.   Yes, he did.

21  Q.   Did the Mercury Mountaineer ever return back to East

22  Hyde Park while you were there?

23  A.   Not when I was present, no.

24  Q.   Okay.  What did Mr. Howard do when he returned to the

25  East Hyde Park location?

1    A.   He took two kilograms of cocaine inside -- from the

2    vehicle inside the apartment to give to Claude McKay.

3    Q.   Following this meeting inside the residence of East Hyde

4    Park, did you and other members of your team meet with

5    Mr. Howard?

6    A.   Yes, I did.

7    Q.   Did you recover anything from Mr. Howard?

8    A.   Yes.  I recovered a duffle bag, a black duffle bag, with

9    five kilograms of cocaine with the word "Mary" on it on the

10   outside.  And I also recovered the previous recorder that I

11   provided to him.

12   Q.   Did you search Mr. Howard and his undercover vehicle

13   following his meeting -- following his participation in the

14   transaction that day?

15   A.   Yes.  I searched him and then debriefed him.

16   Q.   And during your debrief did you confirm with Howard that

17   the Eric he had previously referred to was, in fact, the

18   defendant whom you had previously showed him a photograph of?

19   A.   Yes, I did.

20   Q.   Special Agent Durante, I just want to ask you a few

21   questions concerning the attempts that you made in order to

22   locate the Mercury Mountaineer later that evening.

23        Did you and other members of your team make an

24   attempt to locate the Mercury Mountaineer later that evening?

25   A.   Yes, we did.

1    Q.   What steps, if any, did you and other members of your

2    team take in order to locate that vehicle?

3    A.   I sent my team members down to Y2K Performance because I

4    had previously established that is Mr. Dillard's business.  I

5    established that Mr. Dillard was driving the vehicle, so I

6    sent other team members down to his business to locate the

7    Mercury, because that's where I assumed would be -- that's

8    where it would be.

9    Q.   Showing you what's been marked for identification as

10   Government Exhibit Map 5, do you recognize that exhibit?

11   A.   Yes, I do.

12   Q.   What is that?

13   A.   It's a bird's eye view of Mr. Dillard's Y2K Performance

14   located at 16114 Vandustrial Lane in South Holland, Illinois.

15   Q.   And does this overhead photograph fairly and accurately

16   depict, in general terms, the location that you sent two

17   members of your team to on the evening of May 26th, 2008?

18   A.   Yes, it does.

19            MS. JENKINS:  The government would move to admit

20   Government Exhibit Map 5.

21            THE COURT:  Is that Vandustrial Lane?

22            THE WITNESS:  Yes, sir.

23            THE COURT:  Any objection, Mr. Crowe?

24            MR. CROWE:  No, your Honor.

25            THE COURT:  That exhibit is admitted.

Durante - direct

```
1          MS. JENKINS:  Thank you.
2          (Said exhibit was received into evidence.)
3    BY MS. JENKINS:
4    Q.   Did you eventually arrive to this address on Vandustrial
5    Lane in South Holland?
6    A.   Yes, I did.
7    Q.   When you arrived there did you observe whether or not
8    the Mercury Mountaineer was at that location?
9    A.   Yes, I did.
10   Q.   Where was it, generally speaking?
11   A.   I don't recall exactly.  It was in the parking lot
12   across the way somewhere.
13   Q.   Did you communicate with members of your team whom you
14   had sent before you concerning whether or not Mr. Dillard had
15   been located?
16   A.   Yes, I did.
17   Q.   And what did you learn about whether or not Mr. Dillard
18   had been located at this Vandustrial Lane commercial
19   property?
20   A.   I learned that they set up surveillance on the property
21   and the Mercury, and they saw Mr. Dillard exit the business
22   and travel to a gas station to meet up with another
23   individual, who was later identified as Devan Neal.  And
24   after that meeting they subsequently detained him.
25   Q.   Subsequently detained who?
```

1    A.   Mr. Dillard.

2    Q.   Okay.  When -- based on your conversations with your

3    fellow law enforcement officers, when other agents observed

4    Mr. Dillard leave the residence -- leave the business on

5    Vandustrial Lane, was he driving the Mercury Mountaineer?

6    A.   No.  He was driving his -- a personal vehicle of his.

7    Q.   He was driving a different vehicle?

8    A.   Yeah.  I'm not sure which one he was, but it was not the

9    Mercury.  The Mercury did not move.

10   Q.   And that was actually going to be my next question.

11              Is it -- during the time that you were present

12   outside Vandustrial Lane, was the Mercury Mountaineer outside

13   the business residence that you had associated with

14   Mr. Dillard?

15   A.   Yes, it was.

16   Q.   At some point Mr. Dillard was detained and brought back

17   to the Vandustrial location, is that correct?

18   A.   That is correct.

19              MS. JENKINS:  Okay.

20              At this time, your Honor, the government would

21   tender the witness for cross-examination.  I think that given

22   the stipulations and agreements the parties had on the front

23   end, there really is no need to get into any additional

24   information based on the parties' agreement.  So we would

25   tender the witness at this time.

 1              THE COURT:  The issue, as you see it, is whether or
 2    not there was probable cause to arrest the defendant?
 3              MS. JENKINS:  Correct.
 4              THE COURT:  Very well.
 5              Mr. Crowe?
 6              MR. CROWE:  Thank you, your Honor.
 7                        CROSS EXAMINATION
 8    BY MR. CROWE:
 9    Q.   Agent Durante, what did you do to prepare for your
10    testimony today?
11    A.   I went over it with the prosecuting attorney and
12    reviewed my reports.
13    Q.   So did you review all the DEA reports that you authored
14    according to Box 5 of those reports?
15    A.   No, sir, I didn't.
16    Q.   You did not review them all?
17    A.   All of them?  No.  Not in this investigation, no.
18    Q.   I'm sorry?
19    A.   Not the scope of the entire investigation because
20    there's numerous reports that I authorized.  Most of them --
21    it's a large scale investigation.  Just the limited few that
22    had to deal with Mr. Dillard in this transaction and the
23    previous debriefings of the CF.
24              MR. CROWE:  Your Honor, may I approach the witness
25    to show him some DEA reports and ask him which ones he

1   reviewed?

2           THE COURT:  Sure.

3           MS. JENKINS:  Your Honor, I think the ELMO will

4   allow everyone to see --

5           THE COURT:  I can see it if you put it on the ELMO

6   and --

7           MR. CROWE:  Oh, okay.  Fine.

8   BY MR. CROWE:

9   Q.   So this is the document I will be referring to.  This is

10  defendant Eric Dillard's amended Bates numbered exhibits in

11  support of his motion to suppress.  Docket number is 87.

12          Here's the cover page to Exhibit 1.  The first

13  document -- these documents are -- are you familiar with the

14  term Bates numbered?

15          THE COURT:  Let me do this:  We're trying to save

16  some time.  There's no objection.  Can you let him go through

17  those and tell you which ones -- after he reviews them, which

18  ones he looked at?

19  BY THE WITNESS:

20  A.   Sir, if you just show me the title of the first -- of

21  the front, right there, the title, I can tell you yes or no.

22          THE COURT:  Why don't we do this:  Take the entire

23  package, if you will.

24          THE WITNESS:  Okay.

25          MR. CROWE:  Okay.  Great, your Honor.

 1    BY MR. CROWE:

 2    Q.   What I'm going to do is ask you to look at the numbers

 3    ED 1 through 18, okay?

 4    A.   Okay.

 5    Q.   I'll show you where the numbers are.

 6               THE COURT:   Why don't you just give him that and

 7    let him tell us which ones he reviewed.

 8               MR. CROWE:   I will.

 9          (Document tendered.)

10               THE COURT:   What exhibit designation did you give

11    that, Mr. Crowe?

12               MR. CROWE:   That's Exhibit 1 to my motion to

13    suppress.  And I'll make it Defense Exhibit 1 for the

14    hearing.

15               THE COURT:   We'll call it Defendant's 1?

16               MR. CROWE:   Yes.  Thank you.

17               THE COURT:   And that's Bates 1 through 18?

18               MR. CROWE:   Yes.

19          (Brief pause.)

20    BY THE WITNESS:

21    A.   Okay, sir.  Yeah, I reviewed all these reports that have

22    my signature.

23    BY MR. CROWE:

24    Q.   All right.  Thank you.

25               In preparation for your testimony did you also

Durante - cross

1  listen to the CD-ROM of the Vincent Todd Howard body

2  recording?

3  A.   Portions of it.

4  Q.   Pardon me?

5  A.   Portions of it, yes.

6  Q.   Now, you also testified that you placed -- or provided

7  Howard with an electronic recording device he was to wear on

8  his body?

9  A.   Yes, sir, I did.

10  Q.   And I believe you testified that device performed two

11  functions.  One was it recorded material, and the second is

12  it served as a transmitter, is that correct?

13  A.   Yes, sir.

14  Q.   Now, having listened to at least portions of the CD-ROM

15  of the recording made by the electronic recording device that

16  you gave to Howard, were you able to hear anything beyond

17  what is on the CD-ROM?

18  A.   No, sir.  I don't recall hearing anything from the

19  transmitter.  That's why I communicated with them over cell

20  phone.

21  Q.   Okay.  So, in essence, you didn't really hear anything

22  through the live contemporaneous transmission from the

23  recording device?

24  A.   Not live, no, sir, not at that time.

25  Q.   Now, Howard officially became a DEA informant on

1   February 26th of 2008, is that correct?

2   A.   Around that time.

3   Q.   Now, briefly, can you tell us what were the

4   circumstances that led up to his becoming a confidential

5   informant?

6            MS. JENKINS:  Objection, your Honor.  I think we've

7   covered this.  And I'm also not sure how it's relevant to the

8   probable cause.

9            THE COURT:  How is this relevant?

10           MR. CROWE:  Well, it's, I think, going to show that

11  Howard was -- the DEA knew a lot about him, Howard was a

12  major trafficker and they told him he was looking at a

13  significant, like 15-year mandatory minimum sentence, and

14  that the only way he could reduce that was to produce drug

15  seizures and bodies, meaning arrests.  So that gives

16  confidential Howard a huge motive to fabricate.

17           THE COURT:  Ms. Jenkins?

18           MS. JENKINS:  Your Honor, I think the witness has

19  already established that Mr. Howard was cooperating for the

20  purpose of a reduction in his own sentence.

21           THE COURT:  I agree.

22           MS. JENKINS:  Certainly we're happy to stipulate to

23  what that ultimate sentence was.  Mr. Crowe was certainly

24  aware of that.

25           THE COURT:  Why don't we quickly move on.

1              MR. CROWE:  Okay.

2              THE COURT:  What do you expect him to testify --

3     would you agree to that last statement Mr. Crowe just made?

4              MS. JENKINS:  Could you repeat it?  I think I can.

5              THE COURT:  Would you repeat it?

6              MR. CROWE:  Sure.

7              That the DEA told Mr. Howard that evidence that he

8     was a major trafficker, moving, you know, 60 kilos a month

9     and that he was looking at a mandatory minimum sentence of

10    15 years or more, and the only way he could reduce that was

11    by cooperating with the DEA, which meant providing

12    information and performing actions that led to the seizure of

13    large quantities of narcotics and a significant number of

14    arrests.

15             THE COURT:  Will you stipulate the DEA told him

16    that?

17             MS. JENKINS:  I will agree -- I'm not trying to

18    make this difficult.

19             I will agree that Mr. Howard was told that he was

20    -- that the DEA was aware that he was involved in large

21    quantities of cocaine trafficking activity and that he would

22    be subject to a substantial sentence, including a potential

23    mandatory minimum of ten years.

24             I think that captures what he says, but I don't

25    know specifically whether or not he was told --

1          THE COURT:  Will you accept that stipulation?

2          MR. CROWE:  Yes.

3          THE COURT:  All right.  Very well.  The record will

4     so reflect.

5     BY MR. CROWE:

6     Q.   Among other things, Howard told you that Michael King

7     was supplying him with large quantities of narcotics, is that

8     correct?

9     A.   Yes, it is.

10    Q.   And he also told you that he was not the only person to

11    whom King was supplying substantial quantities of narcotics,

12    is that correct?

13    A.   That's correct.

14    Q.   And one of the people to whom King was supplying

15    substantial quantities of narcotics was Claude McKay?

16    A.   Yes, it was.

17    Q.   Now, at some point on May 26th of 2008 Howard telephoned

18    you and advised you that King himself and Claude McKay would

19    be involved in picking up five kilograms of cocaine later

20    that day, is that correct?

21    A.   That's correct -- that King was supposed to give him

22    five kilograms, correct.

23    Q.   All right.  But it was your understanding that King did

24    not yet have it in his possession at that time?

25    A.   Right, correct.

1   Q.   But that King was going to take action, or have others

2   take action on his behalf, to acquire possession of --

3          THE COURT:  I think that's all been established.

4   Let's avoid, if you can, rehashing direct.

5          MR. CROWE:  Okay.

6   BY MR. CROWE:

7   Q.   And the people who were going to be involved in the

8   acquisition of the cocaine were -- there were three:  Howard

9   himself, Michael King and Claude McKay, correct?

10  A.   That's all I knew of, correct.

11  Q.   There was no mention of a fourth person?

12  A.   No, there wasn't.

13  Q.   And he never -- he did not mention Eric Dillard's name

14  at that time?

15  A.   Who did not mention --

16  Q.   Howard.

17  A.   Not during that time, no.

18  Q.   During -- on approximately May 26th of 2008, based upon

19  your work as a DEA agent did you have a pretty good idea of

20  what the wholesale price was for a kilogram of cocaine in

21  Chicago at that time?

22          MS. JENKINS:  Objection, relevance.

23          THE COURT:  What's the relevance of that?

24          MR. CROWE:  In terms of the amount of cash that

25  would likely have been --

```
 1              THE COURT:  All right.
 2              You may answer.
 3    BY THE WITNESS:
 4    A.   I probably did.  I can't recall -- I'm sure I did.  I
 5    can't recall.
 6              THE COURT:  Do you have a number?  You can lead
 7    him.
 8    BY MR. CROWE:
 9    Q.   Say between 20 and $23,000 per kilogram.
10    A.   Approximately, yeah.  That -- right now it's hard to say
11    what it was back then.  But back then I would have known.
12    That sounds approximately right.
13              THE COURT:  I'll take the answer 20 to 23K --
14    23,000.
15    BY MR. CROWE:
16    Q.   Let's assume it was a low figure of 20,000, just to make
17    the math easy.
18              So if, you know, King, McKay and Howard are buying
19    five kilos -- well, taking the low number 20,000, that would
20    mean they would have $100,000 in cash?
21              MS. JENKINS:  Objection, your Honor.  The issue
22    here is probable cause and not --
23              THE COURT:  I understand that.  You wanted to
24    establish the amount in the duffle bag.  I can -- you can
25    argue that five times 20,000 is a hundred thousand dollars.
```

Durante - cross

```
 1              MR. CROWE:  Okay.  Thank you, your Honor.  I'll
 2    move on.
 3              THE COURT:  Okay.
 4    BY MR. CROWE:
 5    Q.   Prior to your setting up your surveillance in front of
 6    924 Hyde Park Boulevard, did you ask Howard whether he knew
 7    what vehicles were going to be used for the pickup of the
 8    five kilograms of cocaine later that day?
 9    A.   The only one that we knew were going to be used was our
10    UC vehicle.
11    Q.   So you did not know the Mountaineer was going to be
12    used --
13    A.   No, I did not.
14    Q.   -- before it actually was used?
15    A.   No, I did not.
16              THE COURT:  We're off the record.
17         (Discussion had off the record.)
18    BY MR. CROWE:
19    Q.   Now, for purposes of brevity, my understanding is that
20    -- well, you testified, I believe, there were eight law
21    enforcement agents involved in this surveillance operation,
22    is that correct?
23    A.   Approximately, correct.
24    Q.   And some of them were not DEA agents?  Some of them were
25    local law enforcement agents?
```

1   A.   Task force officers, correct.

2   Q.   For the purpose of my questions being simple, I would

3   like to just refer to all of them as agents, even if they

4   were not an actual agent.  Is that okay with you?

5   A.   That's fine.

6   Q.   Now, at approximately 7:00 o'clock p.m. on May 26th of

7   2008, you and the other, I believe, seven agents involved had

8   a meeting to formulate a surveillance plan, is that correct?

9   A.   Approximately.

10  Q.   All right.

11  A.   Yes, it is approximately that time.

12  Q.   At that time did you -- during that meeting did you and

13  the other agents decide what positions the various members of

14  the team would take for purposes of conducting surveillance

15  on 924 Hyde Park Avenue?

16  A.   Yes.

17  Q.   At the time of this preparatory meeting, were you

18  familiar with the vicinity of 924 Hyde Park Avenue?

19  A.   Yes, I was.

20  Q.   And I believe you testified on direct examination that

21  from where you were positioned for surveillance purposes, you

22  could not see the entrance of 924 Hyde Park Avenue?

23  A.   Correct.

24  Q.   Now, having read the DEA reports, is it accurate to say

25  that the only one of the eight agents conducting the

Durante - cross

1   surveillance, who actually could see the front entrance of

2   924 Hyde Park Avenue, was Sergeant Dwayne Johnson?

3   A.   That's correct.

4   Q.   So there were eight agents on surveillance and only one,

5   Sergeant Johnson, could actually see the entrance of 924 Hyde

6   Park Boulevard?

7   A.   Correct.

8   Q.   Was Mr. Dillard's name mentioned at any time during your

9   pre-surveillance prep meeting?

10  A.   No, it was not.

11  Q.   Now, all of the reports that I showed you, which are

12  Bates numbered 1 through 18, on the last page contain a

13  section entitled Indexing.  Are you familiar with that

14  section?

15  A.   Yes, sir, I am.

16  Q.   All right.  And is it true that in the Indexing section

17  of each of those reports it lists the names of the subjects

18  who are referenced in the reports?

19  A.   Yes, sir, it does.

20  Q.   Is it also true that in the Indexing section, when it

21  lists the name of a subject who is referenced in the report,

22  it also lists something called their NADDIS, N-A-D-D-I-S,

23  report number?

24           MS. JENKINS:  Objection, your Honor.  I don't see

25  the relevance of a NADDIS number.

1    THE COURT:  What's the relevance of all of this,
2    Mr. Crowe?
3    MR. CROWE:  Well, I'm trying to figure out what
4    information the agent had available to him, what he actually
5    looked at in terms of what he knew --
6    THE COURT:  Well, he told you he looked at Bates
7    Nos. 1 through 18.
8    MR. CROWE:  Yes.  He may have looked at other
9    things.
10    THE COURT:  Why don't you ask him that.
11    MR. CROWE:  All right.
12    BY MR. CROWE:
13    Q.  Well, did you -- all right.
14    Prior to conducting the surveillance of 924 Hyde
15    Park Boulevard, did you look at a NADDIS report regarding
16    Michael King?
17    A.  Yes, I did.
18    Q.  And did you look at a NADDIS report regarding Claude
19    McKay?
20    A.  Yes, I did.
21    Q.  Did you look at a NADDIS report regarding -- you
22    probably did this before, but at any time did you look at a
23    NADDIS report regarding Vincent Todd Howard?
24    A.  Yes, I did.
25    Q.  Before you conducted your surveillance did you look at a

1   NADDIS report regarding Eric Dillard?

2   A.   Yes.  Previous to this investigation -- previous to that

3   day, yes.

4   Q.   And that would be in April of 2008?

5   A.   Most likely, or shortly thereafter, after we identified

6   him in earlier debrief.

7   Q.   In the context of your preparing for the surveillance of

8   924 Hyde Park Boulevard on May 26th of 2008 -- well, between

9   when Mr. Howard called you and notified you that there was

10  going to be a meeting at that location to discuss the plans

11  to acquire the cocaine and when you set up your surveillance,

12  did you look at the NADDIS regarding Mr. Dillard during that

13  timeframe?

14  A.   No, I didn't.

15  Q.   What information is contained in a NADDIS report?

16          MS. JENKINS:  Objection, your Honor.  We --

17          THE COURT:  I beg your pardon?  What information is

18  contained in what report?

19          MR. CROWE:  In a NADDIS.

20          MS. JENKINS:  Your Honor, first of all, we actually

21  dealt with this issue in a pretrial ruling, whereby Mr. Crowe

22  sought production of the NADDIS report, and the government

23  responded as to all the reasons why it need not be produced

24  and your Honor ruled that it need not be produced.  So I

25  don't know where we're going with this.

1           THE COURT:  Where are you going with this,

2    Mr. Crowe?

3           MR. CROWE:  Well, I would like to see -- I think,

4    as I said in my motion -- and, actually, in my current motion

5    I'm renewing my motion for production of the NADDIS.

6           I think it says -- it delineates all the known

7    associations someone like Michael King, for example, may have

8    had --

9           THE COURT:  You've asked him what he looked at

10   regarding the defendant prior to the May 26th, '08 events.

11   He told you, hasn't he?

12          MR. CROWE:  All right.  He said he did not look at

13   the NADDIS.  So I'll move on.

14          THE COURT:  Okay.

15   BY MR. CROWE:

16   Q.   So prior to your conducting surveillance at 924 Hyde

17   Park Boulevard, did Mr. Dillard's name come up in any way?

18   A.   No, it did not.

19   Q.   Did you see Mr. Dillard arrive in the vicinity of 924

20   Hyde Park Avenue during the evening hours of May 26th, 2008?

21   A.   No, I didn't.

22   Q.   So you have no idea what vehicle he arrived in?

23   A.   No, I don't.

24   Q.   Did you or any members of your team drive down the block

25   of 924 Hyde Park Avenue and attempt to look at the license

Durante - cross

1  plate numbers of cars that were parked there and see if there

2  were people parked there who didn't live in the area?

3  A.  No.  That wouldn't be -- that wouldn't be a typical --

4  Q.  That would not be typical?

5  A.  No.  We don't check license plates like that.

6  Q.  Did you see a red pickup truck parked in the vicinity of

7  924 Hyde Park Avenue?

8  A.  No, I didn't.

9  Q.  Did you see the informant, Howard, depart 924 Hyde Park

10 Avenue at approximately 9:40 p.m. on May 26th, 2008?

11 A.  No, I didn't.

12 Q.  Now, at that time were you in -- were you in any

13 communication with Sergeant Dwayne Johnson?

14 A.  Yes, I was.

15 Q.  Was he contemporaneously reporting his observations of

16 what was transpiring at the entrance of 924 Hyde Park Avenue

17 to you?

18 A.  Yes, he did.

19 Q.  At approximately 9:40 p.m. did Sergeant Dwayne Johnson

20 make any communication to you regarding observations he made

21 regarding the entrance of 924 Hyde Park Avenue?

22 A.  He said that the CS and another black individual male

23 came out with him -- exited that property.

24 Q.  And would it be accurate to say that he said an unknown

25 black male with a dark complexion exited with Howard?

1   A.   I don't recall exactly how -- I don't remember him

2   describing him.  I just remember unknown black individual,

3   black male.

4   Q.   So you don't remember -- if Agent Johnson provided a

5   physical description of that person, you don't remember what

6   it was?

7   A.   He might have but -- that would be normal but I can't --

8   sitting here today I can't recall what he provided, if he

9   provided like an exact description or what he said.

10  Q.   Now, between the time when Howard went inside 924 Hyde

11  Park Avenue, which -- could I just call it the McKay

12  residence?

13  A.   That's fine.

14  Q.   Okay.  Between when Howard went inside the residence and

15  -- until when he exited at approximately 9:40 p.m., the DEA

16  had no independent knowledge of what was transpiring inside

17  McKay's residence, is that correct?

18  A.   That's correct.

19  Q.   And the only source of information the DEA had as to

20  what had transpired within McKay's residence during that time

21  was Howard, is that correct?

22  A.   That's correct.

23  Q.   Did you -- at approximately 9:40 p.m. or shortly

24  thereafter, again on May 26th of 2008, did you see Howard

25  drive the undercover vehicle away from the vicinity of the

1  McKay residence?

2  A.  Yes, after a short period we maintained -- Johnson saw

3  it and then we picked up surveillance on him, correct.

4  Q.  What was the approximate total time that you and the

5  other seven agents were conducting surveillance on the McKay

6  residence?  Just an estimate or ballpark is fine.

7  A.  I mean, we left to the residence around 9:00, so it

8  wasn't that long.  9:00 to 9:40 we think he approximately

9  came down, so I would say under an hour.

10  Q.  All right.  Roughly 40 minutes, it sounds like?

11  A.  Roughly.

12  Q.  Okay.

13      During the time you were conducting surveillance of

14  the entrance of the McKay residence, did you observe other

15  people going into and out of that location -- wait.  I'm

16  sorry.  You didn't see the location.

17  A.  Right.

18  Q.  Let me withdraw that question.

19  A.  I didn't have visual on the front, and I don't recall

20  him -- he wouldn't have called anybody out to notify because

21  it wasn't pertinent to what we were doing.  So I can't answer

22  -- I really can't answer that.

23  Q.  So did Sergeant Johnson, who could see the entrance of

24  924 Hyde Park Avenue, report that during the time of your

25  surveillance he saw other people going into and out of that

1    location?

2    A.   He didn't report -- he wouldn't have.  It's not

3    pertinent to what we were doing.

4    Q.   May 26th was Memorial Day, is that correct?

5    A.   Yes, sir, it was.

6    Q.   At some point did you become aware that Claude McKay was

7    hosting a Memorial Day barbeque at that time?

8    A.   I think he later told us, Mr. McKay did.

9    Q.   Do you remember, you know, what, if anything, Sergeant

10   Johnson conveyed to you over the radio regarding any

11   observations he made regarding Howard leaving the McKay

12   residence at 9:40 p.m. on May 26th?

13   A.   Not specifically.  Just that he was leaving and another

14   male with his him, black male.

15   Q.   When you say another man was with him -- well, let me

16   rephrase.

17            Did the substance of Mr. Johnson's communication

18   say that the other person was leaving just -- at the same

19   time as Howard or that they were together, meaning apparently

20   acting with some common purpose?

21   A.   It led me to believe that they were together, that's

22   what he was saying, came out with him, meaning that he was

23   with him.

24   Q.   Did Sergeant Johnson at that time explain why he

25   believed that Howard and the unknown black male were together

1   as opposed to just coincidently leaving at the same time?

2   A.   No.  He didn't go into that detail.

3   Q.   So your -- just by today, your best recollection of the

4   description Sergeant Johnson gave of the person who left the

5   McKay residence with Howard is that he was a large, black

6   male?

7   A.   Yeah.  I mean, it was six years ago, so it's --

8   Q.   I understand.  But that's your best recollection as you

9   sit here today?

10  A.   Black unidentified male, that's what I remember.

11  Q.   Okay.  Would you agree that that description would fit a

12  lot of people?

13           THE COURT:  I'll take judicial notice of that.

14  Let's move on.

15           MR. CROWE:  Okay.  Thank you, your Honor.

16           Your Honor, with the Court's permission I would

17  like to show the witness some photographs of various

18  individuals that the government has provided me --

19           THE COURT:  All right.

20           MR. CROWE:  -- and see if he recognizes them.

21           THE COURT:  Sure.

22           What exhibits are those?

23  BY MR. CROWE:

24  Q.   Now, just to be clear, on each of these photos in the

25  lower right-hand corner there's a marking that identifies the

```
 1        individual depicted in the photo --
 2                THE COURT:  Oh, come on.  We can move on.
 3                Take a look at those.  Do you recognize any of
 4        those people?
 5        BY MR. CROWE:
 6        Q.   I want to know if you recognize any of those people
 7        prior to or on May 26th of 2008, and, if so, in what context?
 8        A.   I recognize -- this is Michael King.  He's the target of
 9        an investigation --
10                THE COURT:  What's the Government Exhibit on that?
11                THE WITNESS:  King Photo, sir.
12                THE COURT:  King Photo.  Got it.
13        BY THE WITNESS:
14        A.   Target --
15        BY MR. CROWE:
16        Q.   How is it you recognize that that's King?
17        A.   Throughout the investigation I identified him earlier as
18        a large scale narcotics trafficker.
19        Q.   Okay.  And the next one, please?
20        A.   Howard Photo.  It's -- that's my -- the cooperator
21        source.  I obviously recognize him through meeting with him.
22                Claude McKay, also part of a large scale
23        investigation, one of Michael King's workers or --
24        Q.   Were you familiar with him prior to receiving the
25        telephone call from Howard on May 26th of 2008?
```

1    A.    Yes, I was.

2    Q.    Okay.

3    A.    And Devan Neal, Mr. Howard identified him previously as

4    a wholesale supplier of cocaine down in Kentucky Michael King

5    was dealing with.  He would give him kilograms of Kentucky --

6    of cocaine to sell in Kentucky.

7    Q.    Okay.  Thank you.  I'll retrieve the photos.

8              Now, you just testified that Vincent Todd Howard

9    told you that Devan Neal was involved in transporting

10   multi-kilograms of cocaine that he obtained from King from

11   Chicago to Kentucky.

12   A.    Yes.

13   Q.    Did Howard also tell you that for the purposes of

14   transporting the cocaine from Chicago to Kentucky, that Devan

15   Neal used a -- often used a blue Mercury Mountaineer?

16   A.    He told me that -- actually, the Mercury was new --

17   newly installed -- Mr. King was getting a trap installed for

18   Mr. Neal, yes, that's correct, but a newly involved vehicle.

19   Q.    Did Howard also tell you, in fact, that the specific

20   purpose of installing the trap in the blue Mountaineer was to

21   facilitate Devan Neal's transportation of cocaine from

22   Chicago to Kentucky?

23   A.    Yes, he did.

24   Q.    Mr. Howard also told you that the trap was installed by

25   an outfit I believe called AVI?  Does that ring a bell?

1   A.   I don't recall.  The name rings a bell, but I'm not sure
2   if Mr. Howard told me that or if I had learned that at --
3   earlier in the investigation.
4   Q.   Is it also the case that -- let's just call it the King
5   organization for purposes of simplicity --
6   A.   That's fine.
7   Q.   -- had multiple cars involving -- that had, you know,
8   concealed compartments?
9   A.   Yes, definitely.
10  Q.   In fact, isn't it the case that the undercover vehicle
11  that you provided to Howard also had a concealed compartment
12  in it?
13  A.   Yes, it did.
14  Q.   And there's no evidence that Mr. Dillard was involved in
15  creating these concealed compartments in any of these
16  vehicles --
17          THE COURT:  Why don't we move on.  That's not their
18  theory of probable cause.
19          MR. CROWE:  Okay.
20  BY MR. CROWE:
21  Q.   Now, correct me if I'm wrong, but I believe you
22  testified that you followed Howard's vehicle and the
23  Mountaineer from McKay's residence at 924 Hyde Park Boulevard
24  to the garage at 2 East State Street?
25  A.   Yes, myself and my other team members as well.

1    Q.    Where was your vehicle in relation to the -- you know,

2    Howard's vehicle and the blue Mountaineer?

3             What I'm asking is, were you right behind them,

4    were there cars in between you and them?

5    A.    Normally -- I don't recall, but normally we're not right

6    behind them, obviously for safety and getting -- our chance

7    of our surveillance being compromised.  So usually we put a

8    couple vehicles between the UC and -- or the CS and the

9    Mountaineer so we're not noticed.  But we maintain visual

10   contact on both vehicles all the way.

11   Q.    So given the fact that, first of all, you're following

12   behind the Mountaineer, and secondly, that there was one or

13   more vehicles in between your vehicle and the Mountaineer, is

14   it fair to say that you cannot see the face of the person

15   driving the Mountaineer?

16   A.    I did not see who was driving the Mountaineer.

17   Q.    The portion of the body recording from Howard, that

18   Assistant U.S. Attorney Lindsay Jenkins played for you a few

19   minutes ago, among other things contains Howard being on the

20   phone to you saying that -- roughly, that Eric is following

21   me?

22   A.    Yes.

23             THE COURT:  This has all been established.

24             MR. CROWE:  I'm just laying a foundation for my

25   next question, your Honor.

Durante - cross

1   BY THE WITNESS:

2   A.   Yes, that's what he said.

3   BY MR. CROWE:

4   Q.   At that time did you know whom the Eric was that Howard

5   was referring to?

6   A.   Yes, I did.

7   Q.   How was that?

8   A.   We had previously talked about it, Eric Dillard and --

9   he had mentioned Eric is here.  I didn't ask him any further

10  questions.  I already knew who it was -- Eric was.  It was

11  only Eric that Todd and I actually talked about.

12  Q.   When Howard said Eric was here -- or is here, how did

13  you know -- or what caused you to think that was Eric

14  Dillard?

15  A.   Because we had previously talked about him recently.

16  And he said Eric was here, and Eric was associated with

17  Michael King and Claude McKay.  So I knew that was Eric

18  Dillard, and I confirmed that later when I debriefed him.

19  Q.   Approximately when was the first time that Howard

20  mentioned Eric Dillard to you?

21  A.   About a month ago, when I debriefed him.

22          THE COURT:  You mean a month before the May date?

23          THE WITNESS:  Yes, sir.  Approximately April.

24  BY THE WITNESS:

25  A.   And he also -- during that time he also identified his

1    motorcycle shop.  We have known -- we had known Eric Dillard

2    to be a large scale narcotics trafficker on the south side

3    that runs a motorcycle shop there.

4    BY MR. CROWE:

5    Q.   When you say you had known Mr. Dillard to be a large

6    scale narcotics trafficker, what was the basis of that?

7            MS. JENKINS:  Objection, your Honor.  Again, I

8    think we're getting pretty far afield here, relevance for

9    probable cause.

10           He's already established how he --

11           THE COURT:  I will let him answer that.

12           Can you tell us how --

13   BY THE WITNESS:

14   A.   Yeah.  I had two cooperating sources tell me that and

15   then, again, I looked at other records, information.

16   BY MR. CROWE:

17   Q.   In the reports that I showed you previously, which are

18   Bates numbered ED 1 through 18 -- let me ask you this

19   question and see if you can answer it, and if you can't, I'll

20   show you the reports.

21           Isn't it true that those reports, which are Bates

22   numbered Eric Dillard ED 1 through 18, make no mention of an

23   April 2008 debriefing of Howard?

24   A.   I'm not sure.  I would have to see them again.

25   Q.   I guess the reports are in evidence.  I won't go through

1    -- the Court can look at them. They speak for themselves.

2          THE COURT: Why would you have to ask him this?

3    We've got the reports.

4          MR. CROWE: Okay.

5          THE COURT: You're moving the admission of those, I

6    take it, Mr. Crowe?

7          MR. CROWE: Yes, I am, your Honor.

8          THE COURT: Any objection, Ms. Jenkins?

9          MS. JENKINS: No.

10          THE COURT: Those are in evidence.

11       (Said exhibits were received into evidence.)

12    BY MR. CROWE:

13    Q.    All right. We've established that the -- at some point

14    the -- whatever was recorded on the body recording device

15    that you equipped Mr. Howard with was converted to a CD-ROM?

16    A.    That's correct.

17    Q.    When did you first listen to the contents of the

18    material that the Howard body recording device had picked up

19    on May 26th and maybe May 27th of 2008?

20    A.    When did I first listen to his body --

21    Q.    Yes.

22    A.    I don't recall.

23    Q.    Well, was it before or after the DEA had the sheriff

24    pull over and detain Mr. Dillard?

25    A.    It would be after that.

1   Q.   And you testified, I think, that -- did you see Howard's
2   undercover vehicle and the blue Mountaineer enter the garage
3   located at 2 East 8th Street?
4   A.   Other agents did.  I didn't.
5   Q.   And is it accurate that none of the eight agents who
6   were involved in the investigation at this time could see
7   what was going on inside the garage?
8   A.   That is correct.
9   Q.   So having listened to the recording created by the body
10  recorder Howard was wearing, is it fair to say that the only
11  thing that one can hear during the transaction in the garage
12  is Howard calling the DEA?
13  A.   I think there's other conversations on there.  I'm not
14  sure how audible they are or not.
15  Q.   Well, let me ask you this then:  If the recording device
16  also functions as a transmitter, during the time Howard was
17  inside the garage at -- on 2 East 8th Street, I believe, and
18  you were listening to the transmitted communications, did you
19  hear anything you thought was significant coming over the
20  transmitter?
21  A.   I don't recall hearing anything.
22            THE COURT:  How much more do you have, Mr. Crowe?
23            MR. CROWE:  Your Honor, I'm moving very rapidly.
24            THE COURT:  Okay.  How much more would you guess
25  you have?

1          MR. CROWE:  Oh, I would guess, say, 20, 30 minutes.

2          THE COURT:  Okay.  Let me ask you to stay closer to

3     20 minutes.

4          MR. CROWE:  I'm leaving out a lot.  I'm skipping

5     over a lot trying to be as expeditious as I can.

6          THE COURT:  Okay.

7     BY MR. CROWE:

8     Q.  Is it accurate that at the time you caused -- you and

9     other agents caused Mr. Dillard to be detained later that

10    evening, the only information you had about what had

11    transpired in the garage was what Mr. Howard -- what Howard

12    told you?

13    A.  That's correct.

14    Q.  From your recollection of the reports that you authored,

15    isn't it true there's nothing in the reports that indicates

16    that when Howard said, Eric is following me, you knew that he

17    was referring to Eric Dillard?

18    A.  Yeah.  I didn't put that in the report.

19    Q.  You did not put that in your report?

20    A.  No, sir, I didn't.

21    Q.  Isn't it the case that when Howard first told you about

22    the drug pickup -- well, at all times before Howard went into

23    the garage he told you it was going to be a five-kilogram

24    transaction, is that correct?

25    A.  Yes, he did.

Durante - cross

1  Q.   Then when he's in the garage, is it correct that he
2  makes a telephone call to you or other agents saying the
3  five-kilogram deal has now become a 25-kilogram deal?
4  A.   I don't think he made that call until after he left the
5  garage, if I remember correctly.
6  Q.   When Howard told you that what was going to be
7  originally a five-kilogram transaction had suddenly become a
8  25-kilogram transaction, did that cause you to be -- you
9  know, raise any skepticism in you?
10        MS. JENKINS:  Objection, your Honor.  We're pretty
11  far afield in terms of the -- the agent has testified as to
12  what he learned.  Whether or not he was skeptical about it or
13  whether or not he was dubious is really not relevant to
14  whether or not there was probable cause.
15        THE COURT:  What's the relevance whether he was
16  skeptical or not?
17        MR. CROWE:  That the only source of information
18  that the agents had regarding the probable cause to detain
19  Mr. Dillard came from Howard, and Howard was not believable.
20        THE COURT:  So you're asking him to comment on
21  whether Howard was believable or not?
22        MR. CROWE:  Whether he believed Howard, in terms of
23  whether he could have reasonably relied in good faith on what
24  Howard was telling him.
25        THE COURT:  Generally a witness testifies to their

1    perceptions.  This would cause him to speculate, it would

2    seem to me.  So I'll sustain the objection.

3    BY MR. CROWE:

4    Q.   In your experience as a DEA agent, isn't it unusual for

5    the size of a transaction -- well, let me backtrack.

6         In your experience as a DEA agent, isn't it typical

7    for the basic terms of the transaction, in terms of the

8    quantity of narcotics and the amount of money to be paid for

9    those narcotics, could be agreed upon in advance?

10        MS. JENKINS:  Objection, your Honor.  I don't see

11   the relevance --

12        THE COURT:  Sustained.

13        MS. JENKINS:  -- to probable cause.

14        THE COURT:  It calls for a conclusion.  I will

15   sustain that.

16   BY MR. CROWE:

17   Q.   Well, is it your experience that when a supplier is

18   going to a narcotics transaction, the supplier only brings

19   the amount of drugs he intends to sell during the

20   transaction?

21        MS. JENKINS:  Same objection.

22        THE COURT:  Sustained.  You would have to qualify

23   him as an expert.

24   BY MR. CROWE:

25   Q.   In the April 16th debrief of Howard, do you recall

1    writing the report of that debrief?

2    A.   Yes, I do.

3    Q.   All right.  In that debrief -- in that report it

4    mentions Eric Dillard only in one place, in Paragraph 13?

5    A.   Correct.

6    Q.   And the only thing that Howard says in Paragraph 13

7    about Mr. Dillard is that he told Michael King where to go to

8    get a trap installed in the blue Mountaineer?

9    A.   I don't recall -- I don't recall that statement --

10   Q.   All right.

11   A.   -- from the --

12   Q.   Well, that report does not state that during the

13   April 16th, 2008 debrief that Howard alleged that Mr. Dillard

14   was a part of the King narcotics trafficking organization?

15   A.   Again, I would have to review that report.

16           THE COURT:  The report is in evidence, is it not?

17           THE WITNESS:  Right.  I have to review --

18           MR. CROWE:  I don't think that one is yet.

19           MS. JENKINS:  We do not object to its admission

20   into evidence.

21           THE COURT:  Why don't you have it admitted, and

22   then you can argue whatever you want from the report.

23           MR. CROWE:  May I approach the witness?

24           THE COURT:  Yes.

25   BY MR. CROWE:

1    Q.   Let's deem this marked for identification as Defense

2    Exhibit 2.

3                THE COURT:  Is that your report, Agent?

4                THE WITNESS:  Yes, sir, it is.

5                THE COURT:  You're moving the admission?

6                MR. CROWE:  Yes.

7                THE COURT:  Okay.  Why don't you move on.

8    BY MR. CROWE:

9    Q.   What is the date on which you prepared this report?

10               THE COURT:  Well, isn't your -- the point of this

11   is that there's no reference in this report to Dillard?

12               MR. CROWE:  I'll get right to it, your Honor.

13   There's one reference.

14               THE COURT:  Okay.  Well, it's in evidence.  Can't

15   you just --

16               MR. CROWE:  Sure.

17               THE COURT:  -- unless you want to ask him questions

18   about it.

19   BY MR. CROWE:

20   Q.   All right.  I direct your attention, please, to

21   Paragraph 13 of your report.

22   A.   Yes.

23   Q.   All right.  Is it true that that Paragraph 13 contains

24   the only reference to Mr. Dillard in that report?

25   A.   Yes, that is true.

1   Q.   And the only reference to Mr. Dillard in Paragraph 13 is

2   that he directed Michael King to the shop where a concealed

3   compartment could be installed in the Mountaineer?

4   A.   I see that.  It's a reference about concealed

5   compartments and about Dillard selling large quantities of

6   cocaine.

7   Q.   Well, that's in the Indexing section, correct?

8   A.   No, sir.  It's in the paragraph as well as

9   identification of his Y2K Performance.

10          MR. CROWE:  I'll take the report back, give it back

11   to Ms. Jenkins.

12          MS. JENKINS:  You can keep it.

13          (Brief pause.)

14          THE COURT:  You may proceed, Mr. Crowe.

15   BY MR. CROWE:

16   Q.   Now, you testified that the -- that agents observed the

17   three vehicles, the Mountaineer, the undercover car Howard

18   was driving and a maroon vehicle, leave the parking garage at

19   about the same time?

20   A.   Yes, that's correct.

21   Q.   That was approximately 10:03 p.m.?

22   A.   That's correct.

23   Q.   At that point is it correct that there were eight agents

24   in the vicinity of the parking garage?

25          THE COURT:  I think we've established that,

1    Mr. Crowe.

2              MR. CROWE:  All right.

3    BY MR. CROWE:

4    Q.   So if there were eight agents in the vicinity of the

5    garage, that would mean there were eight agents available to

6    follow the three vehicles, is that correct?

7    A.   That's correct.  Some of them together, some of them

8    weren't.  I'm not sure how many vehicles we had.

9    Q.   So there really wasn't a lack of manpower to follow the

10   three vehicles, is that correct?

11             MS. JENKINS:  Objection, your Honor.  We're getting

12   into strategy about why the DEA followed who they followed.

13   That doesn't have anything to do with probable cause.

14             THE COURT:  Where are you going with this,

15   Mr. Crowe?

16             MR. CROWE:  Well, they -- what winds up happening

17   is there's like a 52-minute gap between when the Mountaineer

18   leaves the garage and when they find it.  I'm trying to

19   figure out what happened and how they lost track of it.

20             THE COURT:  Well, isn't the government's theory

21   that probable cause has been established at this time?

22             MS. JENKINS:  Correct.

23             THE COURT:  What difference does it make?

24             MR. CROWE:  Well, I think it's -- a big part of

25   their theory is that the blue Mountaineer containing -- which

Durante - cross

1  was later found to contain three kilograms of cocaine, was

2  parked in the parking lot where Mr. Dillard's business is

3  located.

4          THE COURT:  Right.  Well, how is that affected by

5  the fact that they didn't properly follow the Mountaineer?

6          I mean, it's been conceded there were eight agents,

7  the Mountaineer and the maroon GMC got away.

8          MR. CROWE:  My theory is that --

9          THE COURT:  Why don't we move on?

10          MR. CROWE:  Pardon me?

11          THE COURT:  Why don't we move on?

12          MR. CROWE:  Okay.

13  BY MR. CROWE:

14  Q.   So as I understand your testimony, the agents did

15  attempt to follow the Mountaineer but lost track of it?

16  A.   Yes, sir.  We tried to locate it, lost track of it.

17  Q.   And how was it about, say, 52 minutes later agents

18  decided to go to Mr. Dillard's place of business in search of

19  the Mountaineer?

20  A.   As I testified, I already identified Eric Dillard and I

21  -- Mr. Howard told me he was driving it, so I sent agents to

22  where he -- where I knew he would be, which would be his

23  business -- or a place that he could be, which would be his

24  business.

25  Q.   Isn't it true that other people, including Michael King

1  and Devan Neal, had extensive contact with the blue
2  Mountaineer in terms of driving it to various locations?
3  A.  I can't say on Devon Neal.  Michael King, yes.  We
4  followed him in that Mountaineer previous to this
5  transaction.
6  Q.  Well, did Howard tell you the primary purpose for
7  installing the concealed compartment in the Mountaineer was
8  so Devan Neal could transport narcotics from Chicago to
9  Kentucky?
10 A.  Yes, he did.
11 Q.  And isn't it true that Devan Neal was identified as
12 being in the vicinity of the blue Mountaineer during the late
13 evening or night hours of May 26th, 2008?
14 A.  What I recall is we identified him after Mr. Dillard was
15 arrested, and he was driving around the area that we were at
16 and we had him stopped.  And, yes, we did identify him at
17 that time.
18 Q.  So he was present in the vicinity of the Mountaineer,
19 correct?
20 A.  Yes, he was.
21 Q.  Now, according to your report, did -- isn't it the case
22 that Howard asked King, Was all the money from Devan, meaning
23 the money to buy the drugs?
24 A.  Yes, he did.
25 Q.  And by Devan, you understood that he was referring to

Durante - cross

1    Devan Neal?

2    A.   Yes, I did understand that.

3    Q.   Is it -- was it your understanding then that Devan Neal

4    was another major narcotics trafficker?

5    A.   Yes, it was.

6    Q.   Now, at approximately 11:05 p.m. it's the case that

7    agents saw Mr. Dillard leave his business, correct?

8    A.   I was debriefing Howard at that time.  I don't -- I

9    don't think it was at 11:05.  I think that was at a different

10   time that they saw him.  I would have to look at the report.

11   Q.   Well, approximately.

12   A.   Somewhere around 11:00, 11:30, somewhere around that

13   time.

14   Q.   Okay.  And when the agents saw him leave his business,

15   he left in a red pickup truck, not the Mountaineer, correct?

16   A.   Like I said -- as I testified, I don't know what vehicle

17   he left in but it was not the Mountaineer, correct.

18   Q.   Were you present on the scene when the sheriff's deputy

19   pulled over Mr. Dillard's vehicle?

20   A.   No, I was not.

21   Q.   So I take it also, you were not present when agents

22   debriefed Mr. Dillard back at his office after he was

23   detained?

24   A.   Yes, I was.

25   Q.   You were present then?

1    A.    I had made it down there at that point, yes.

2    Q.    Do you recall approximately what time you made it down

3    there?

4    A.    Sometime around midnight, shortly before then, somewhere

5    around that time.

6    Q.    Well, to help me place sequence of events, what was

7    happening when you got to that vicinity?

8    A.    Mr. Dillard was already back at his business and I think

9    we were outside and eventually went inside.  I don't recall

10   what was going on.

11   Q.    Approximately how many agents were inside Mr. Dillard's

12   business when you arrived?

13   A.    I don't know if anyone was inside yet at that time.  I

14   think we were still outside, and then we went inside after we

15   received consent.

16   Q.    Where was Mr. Dillard when you first arrived at his

17   business?

18   A.    I don't recall.

19   Q.    At that time was Mr. Dillard -- Mr. Dillard was

20   handcuffed, wasn't he?

21   A.    I'm not sure if he was still handcuffed -- he was

22   handcuffed when he was arrested and transported.  I'm not

23   sure if he was still handcuffed when I -- by the time I got

24   there or not.

25   Q.    Now, at some point shortly after you arrived at Mr.

1    Dillard's business on the night of May 26th, 2008, the agents

2    took Mr. Dillard inside the business?

3    A.   Yes, we did.

4    Q.   What happened then?

5            THE COURT:  I think this has all been the subject

6    of a stipulation, hasn't it?

7            MS. JENKINS:  Correct.

8            I was just going to say, this is beyond the scope.

9    And now we're beyond the point where the parties have

10   stipulated as to what the facts would show.

11           THE COURT:  Right.  I agree.

12   BY MR. CROWE:

13   Q.   Did you participate in the search of Mr. Dillard's

14   business?

15           MS. JENKINS:  Same objection, your Honor.

16           THE COURT:  We've stipulated to all this.  The

17   government is resting their theory, as I understand it, on

18   whether or not there was probable cause to arrest Mr.

19   Dillard.

20           MS. JENKINS:  Correct.

21           THE COURT:  You've agreed that he's consented to

22   the search and you've agreed that he was read the Miranda

23   warnings.

24           MR. CROWE:  Yes.

25           THE COURT:  What more is there to do after his

1    arrest?

2            MR. CROWE:  Well, I'll just cover one additional

3    issue, your Honor.

4            THE COURT:  Tell me what issue there is remaining

5    post arrest.

6            MR. CROWE:  Well, there's also the issue of the

7    legality of the search of the Mountaineer, which Ms. Jenkins

8    maintains was done pursuant to the automobile exception.  My

9    contention is --

10            THE COURT:  Hold it.  Wait, wait.

11            MR. CROWE:  -- that a search was done --

12            THE COURT:  Wait.

13            If there was probable cause to arrest him, are you

14    now contesting there was not probable cause to immediately

15    search the vehicle that he was driving?

16        (No response.)

17            THE COURT:  We have to move this along.  I'm not

18    trying to foreclose any legitimate area of inquiry, but it

19    appears from the stipulation that the issue is whether or not

20    there was probable cause to arrest him.

21            It's been agreed that he was Mirandized, and it's

22    been agreed that he consented to the search of the --

23            MS. JENKINS:  And it's agreed that there was a

24    canine search around the perimeter of the Mountaineer.

25            THE COURT:  Right.

1           MS. JENKINS:  So all of this stuff goes -- excuse

2      me.

3           All of these matters, from the government's point

4      of view, can be decided --

5           THE COURT:  The stuff, too.

6           MS. JENKINS:  I apologize -- go to matters that can

7      be decided by the Court on the briefs.

8           THE COURT:  I agree.  I agree.

9           MR. CROWE:  Well, I would just like to quickly

10     establish that the search of the Mountaineer was conducted

11     after, then towed to a DEA controlled lot --

12          THE COURT:  That's not in dispute.

13          MR. CROWE:  All right.

14          MS. JENKINS:  We agree.

15          MR. CROWE:  I have nothing further in that case,

16     your Honor.  Thank you.

17          THE COURT:  Very well.

18          Any redirect?

19          MS. JENKINS:  No.

20          THE COURT:  Very well.

21          Agent, you may step down.

22          THE WITNESS:  Thank you.

23          THE COURT:  I still want to know how you get duty

24     in -- what is it?

25          THE WITNESS:  The Bahamas.

Durante - cross

1    THE COURT:  -- the Bahamas.

2    THE WITNESS:  You keep forgetting the location.

3    THE COURT:  We wouldn't want to delay you from

4  getting back to the Bahamas.

5    THE WITNESS:  Appreciate it.

6    (Witness excused.)

7    THE COURT:  Do you want to call your officer

8  tomorrow?

9    MS. JENKINS:  I spoke with Mr. Crowe.  In light of

10  your directive, your Honor, we did release Sergeant Johnson

11  in light of the hour.  If Mr. Crowe wishes, we can bring

12  Mr. Johnson back here tomorrow --

13    THE COURT:  Are you available?

14    MR. CROWE:  I have a --

15    MS. JENKINS:  -- or we can do it a different day.

16    MR. CROWE:  I have a brief matter at 9:15 before

17  Judge Tharp.  I think we'll be concluded in fifteen minutes.

18    THE COURT:  We're off the record.

19    (Discussion had off the record.)

20    THE COURT:  Why don't we recess until tomorrow at

21  10:30.

22    MR. CROWE:  That's fine, your Honor.

23    MS. JENKINS:  And we'll have Sergeant Johnson

24  available.

25    THE COURT:  And if you reach a stipulation, so be

1    it.

2              MS. JENKINS:  Fine.  Thank you, your Honor.

3              MR. CROWE:  Very well.  Thank you, your Honor.

4              THE COURT:  You're welcome.

5         (Which were all the proceedings heard.)

6                        CERTIFICATE

7         I certify that the foregoing is a correct transcript

8    from the record of proceedings in the above-entitled matter.

9

10    /s/ *Mary M. Hacker*                    *September 9, 2014*

11    _____    _____

12    Mary M. Hacker                    Date
      Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25