UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 13-cr-442 |
| v. | ) | |
| | ) | Judge John W. Darrah |
| ERIC K. DILLARD, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Defendant Eric Dillard has filed two Motions to Suppress certain evidence. The Government filed a response in opposition to Defendant's motion. An evidentiary hearing was held to determine the admissibility of the evidence. The parties have submitted post-hearing briefs. After consideration of the facts presented at the hearing and the arguments and authority presented by the parties, Dillard's Motion to Suppress [68] is denied.

## **BACKGROUND**

Prior to commencing the evidentiary hearing, the parties stipulated that: (1) following his detention, Dillard was advised of his *Miranda* rights and waived those rights to speak with law enforcement officers; (2) following his detention, Dillard voluntarily signed a written consent form, allowing law enforcement to perform a search of his place of business that led to the recovery of certain items; (3) the blue Mercury Mountaineer subject to surveillance throughout this case was not registered to Dillard; and (4) a drug-detecting dog alerted law enforcement to the presence of narcotics within the blue Mountaineer. These stipulations left only the issue of whether law enforcement had probable cause to detain Dillard.

The following facts are based upon the testimony of the witnesses examined at the suppression hearing and other evidence submitted by the parties. In 2008, the Drug Enforcement Administration ("DEA"), along with a task force of various local law enforcement, conducted a large-scale investigation of Michael King, a suspected cocaine trafficker. (Sep. 4, 2014 Tr. 20:19-21:2.) DEA Special Agent Eric Durante was among those assigned to investigate King. (*Id.*) Throughout the investigation, Durante worked with numerous cooperating sources, including an individual named Vincent Howard. (*Id.* 21:3-9.)

Howard was familiar with King's trafficking operation because Howard had transported cocaine to Kentucky for sale and brought the proceeds back to King in Chicago. (*Id.* 21:24-22:4.) The DEA informed Howard it was aware of his trafficking activities, that he faced a substantial sentence because of them, and that the only prospect of reducing that sentence was through cooperating in the King investigation. (*Id.* 61:19-23.) Howard agreed to cooperate in the investigation of King. (*Id.* 22:25-23:2.)

Howard was to meet with King to pick up five kilograms of cocaine at the residence of an individual, Claude McKay, at 924 East Hyde Park Boulevard in Chicago, Illinois. (*Id.* 25:9-26:6.) Prior to the meeting, the DEA provided Howard with an unmarked vehicle and a combination audio transmitter and recording device, through which Durante was able to hear any conversations in which Howard was involved. (*Id.* 27:23-29:4.)

After meeting with Howard, Durante positioned himself within a block of 924 East Hyde Park Boulevard and maintained radio contact with Task Force Officer Dwayne Johnson, who was positioned in front of the residence. (*Id.* 30:4-31:15.) Various agents and law enforcement officers maintained surveillance of Howard from the time he left his meeting with Durante until he entered McKay's residence to meet with King. (*Id.* 32:3-5.)

After approximately fifteen to twenty minutes inside McKay's residence, Howard exited the building and called Durante on a cellular phone once he reached the undercover vehicle provided for him. (*Id*. 32:16-33:9.) Howard explained to Durante that he was driving to a parking garage to complete the cocaine transaction and was being followed by "Eric" in a blue Mercury Mountaineer. (*Id*. 40:22-24, 42:2.) Approximately one month prior, Durante showed Howard a photograph, known to Durante to be of Dillard, that Howard identified as "Eric." (*Id*. 38:17-39:13.)

Members of the task force maintained surveillance of Howard as he traveled to the parking garage and were able to identify the blue Mountaineer as one of the vehicles that had been identified in the months prior as belonging to King's organization. (*Id*. 42:5-9.) Durante was able to observe the license plate of the blue Mountaineer. (*Id*. 45:7.) Based on previous information supplied by Howard, Durante knew the blue Mountaineer contained a secret compartment for transporting cocaine. (*Id*. 45:20-46:6.) The blue Mountaineer was not registered to Dillard. (*Id*. 46:10.)

The vehicles eventually entered the parking garage identified by Howard; Durante remained outside and set up surveillance on the outside of the garage. (*Id*. 46:16.) After approximately five minutes, Howard, in the undercover vehicle provided to him, Dillard, in the blue Mountaineer, and a third, unidentified individual in a maroon GMC exited the garage. (*Id*. 47:1-5.) Howard again called Durante to explain that, once inside the garage, Dillard removed a duffel bag containing United States currency and exchanged it with the individual driving the maroon GMC for twenty-five kilograms of cocaine, of which Howard took seven. (*Id*. 47:17-48:3.) Members of the task force followed Howard back to McKay's residence, but lost sight of Dillard and the maroon GMC. (*Id*. 49:11-17.)

3

After returning to McKay's residence, Howard entered and gave two kilograms of cocaine to McKay. (*Id*. 52:1-2.) Howard then met with Durante and turned over a black duffel bag containing five kilograms of cocaine and confirmed that the "Eric" he had referred to on the phone was, in fact, Dillard. (*Id*. 52:8-19.)

Later the same evening, Durante sent task force members to Y2K Performance, a business Durante knew was owned by Dillard, in South Holland, Illinois. (*Id*. 53:3-8.) When Durante arrived at Y2K Performance, he identified the blue Mountaineer in the parking lot. (*Id*. 54:9-12.) Durante knew the Mountaineer as a vehicle associated with King both because Howard previously identified it as such and because the DEA had conducted surveillance of King inside the Mountaineer approximately a month earlier. (*Id*. 45:20-26:1.) Task force members informed Durante that they had set up surveillance around Y2K Performance and, when Dillard drove to a nearby gas station in another vehicle, the task force members detained Dillard. (*Id*. 54:20-24.) Dillard was handcuffed and transported back to Y2K Performance, where he was questioned and his business was searched by law enforcement. (*Id*. 94:4-24.)

**LEGAL STANDARD**

When a defendant moves to suppress evidence, he bears the burden of making a *prima facie* showing of illegality. *United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir.1992). "The burden is on the movant to make specific factual allegations of illegality, to produce evidence, and to persuade the court that the evidence should be suppressed." *United States v. Evans*, 572 F.2d 455, 486 (5th Cir.1978) cert. denied, 439 U.S. 870 (1978). "As the resolution of a motion to suppress is a fact-intensive inquiry, the district court's credibility determinations are reviewed deferentially, given its opportunity at the suppression hearing to hear the testimony and observe the demeanor of the witnesses." *United States v. Kempf*, 400 F.3d 501, 503 (7th Cir.2005).

## ANALYSIS

As mentioned above, the parties agree that Dillard was, in fact, detained by law enforcement. Dillard argues only that he was detained without probable cause and, therefore, any statements he made and any observations made by law enforcement during their post-detention search of Y2K Performance must be suppressed. "A determination of probable cause is based on probabilities and does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *United States v. Bullock*, 632 F.3d 1004, 1022 (7th Cir. 2011) (internal quotations and citations omitted). Therefore, probable cause exists if Durante's testimony shows at least "a probability or a substantial chance that criminal activity exist[ed]." *Id*. (citing *Purvis v. Oest*, 614 F.3d 713, 722-23 (7th Cir. 2010)). "This flexible, commonsense approach does not require that the officer's belief be correct or even more likely true than false, so long as it is reasonable." *Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999) (citing *Texas v. Brown*, 460 U.S. 730, 742 (1983)).

Dillard argues that, to the extent his detention was based on information Howard furnished to law enforcement, it was unreasonable. In support of this argument, Dillard focuses on two areas of Durante's testimony. First, Dillard argues that Howard was a much more important person than Dillard within King's organization. Accordingly, Dillard contends that Howard would not logically have ceded so much responsibility to Dillard in a twenty-five kilogram cocaine purchase and at least would have known where Dillard was taking the remaining seventeen kilos of cocaine. Additionally, Dillard argues that Howard's information was not sufficiently corroborated.

Neither of Dillard's arguments is persuasive. First, claimed inconsistency regarding the level of participation of Dillard in the cocaine transaction does not render Howard's statements

to Durante unreasonable as a basis for probable cause for the arrest of Dillard. Further, these statements were corroborated by contemporaneous and subsequent events set out above. Durante testified that a task force of law enforcement officers were positioned around McKay's residence, observed Howard enter, observed Howard exit with another individual, observed Howard travel to a garage while being followed by a blue Mountaineer, and maintained surveillance of the garage until Howard exited, still being followed by the blue Mountaineer. Howard gave Durante the remaining five kilograms of cocaine and the duffel bag that Howard identified as components of the transaction. Perhaps most significantly, Howard identified Dillard as the driver of the blue Mountaineer, and Durante used this information to track the Mountaineer to the parking lot of Dillard's business. This further corroborates Howard's statements that Dillard drove the vehicle used to transport cocaine.

Accordingly, it was reasonable for officers to conclude there was some probability that Dillard had engaged in a crime.

## CONCLUSION

For the reasons provided above, Defendant's Motion to Suppress [68] is denied.

Date: 10/8/2014

JOHN W. DARRAH
United States District Court Judge